Nathan HABIB, Appellant,

v.

Marie THURSTON, Appellee.

Nos. 84–355, 84–636.

District of Columbia Court of Appeals.

Argued June 17, 1985.
Decided October 11, 1985.
On Petition for Rehearing Oct. 30, 1986.

A. Fred Freedman, Washington, D.C., for appellant.

Joan Politeo, with whom Michael O. De-Mouy, Washington, D.C., was on the brief, for appellee.

Before FERREN and ROGERS, Associate Judges, and PAIR, Senior Judge.

FERREN, Associate Judge:

A landlord appeals from three orders of the motions court: (1) granting summary judgment for the tenant in an action for possession, on the ground that the landlord, by accepting rent for the month after the notice to quit had expired, thereby waived his right to demand possession; (2) awarding the tenant attorney's fees and expenses pursuant to Super.Ct.Civ.R. 37(a)(4), without a hearing, in connection with the tenant's motion to compel answers to interrogatories; and (3) releasing to the tenant funds which she had paid into the court registry under a protective order. We affirm as to the first two orders but reverse and remand as to the third.

## I.

The tenant-appellee, Marie Thurston, leased an apartment "by the month" from the landlord-appellant, Nathan Habib. On October 21, 1983, the landlord served a notice to quit or cure by November 30, citing "overcrowding in breach of lease and D.C. Housing Regulations." The tenant did not surrender the premises; instead, she tendered to the landlord, on December 1, a money order for the December rent.[1] Although the landlord endorsed and deposited this money order, he filed a complaint for possession on December 3, alleging both nonpayment of rent for December and overcrowding of the premises.

On December 19, the tenant filed a verified answer and a counterclaim. In her answer, she presented various defenses, including a denial of rent due for December,

a claim of retaliatory eviction, and allegations of substantial housing code violations that entitled her to a recoupment of any rent "found to be due and owing." The tenant's counterclaim sought judgment against the landlord for "overpayments of rent" because of housing code violations, as well as for expenditures the tenant had made to correct some of these conditions. In addition, the tenant sought injunctive relief and specific performance of her landlord's obligations under the implied warranty of habitability.

That same day, the landlord obtained a protective order directing the tenant to pay $87.50 into the court registry immediately and $197.50 each month thereafter "during the pendency of this case."

In February 1984, the tenant filed a motion for summary judgment, arguing that her landlord, as a matter of law, had waived his right to demand possession by accepting rent for a new term after the notice to quit had expired. The landlord filed a cross motion for summary judgment, claiming entitlement to possession, as a matter of law, because the tenant had acknowledged facts showing conclusively that the premises were overcrowded. The landlord also sought summary judgment on his tenant's counterclaim. He asserted that all the alleged code violations predated a November 1982 default judgment of possession against the tenant, that the tenant could have litigated those alleged violations at the time, and thus that *res judicata* barred relitigation through the present counterclaim.

On March 13, the parties executed a praecipe dismissing both the landlord's claim for possession based on nonpayment of rent, with prejudice, and the tenant's counterclaim, without prejudice. The praecipe further noted that the landlord's action for possession based on alleged over-

---

1. The lease provides that rent is due and payable on the first day of each month "as rent in advance for the ensuing month."

crowding and the tenant's corresponding defenses "survive this praecipe."

The next day, the trial court dismissed the landlord's complaint, granted summary judgment for the tenant, and thus left her in possession.

## II.

▇ The landlord contends the trial court erred in ruling, as a matter of law, that the landlord, by accepting rent after expiration of the notice to quit for alleged overcrowding, had waived his right to demand possession based on that notice (the common law waiver rule). He argues, more specifically, that under the Rental Housing Act of 1980, D.C.Code §§ 45–1501 to –1597 (1981 & Supp.1985) (1980 Act), all tenants—even those under a month-to-month lease—acquire, in effect, a "life tenancy" or at least an indeterminate tenancy, subject to divestment only for nonpayment of rent, for breach of the lease terms, or for other reasons specified in the statute. *See id.* § 45–1561.[2] Under this scheme, according to the landlord, a notice to quit is therefore merely a procedural prerequisite to terminating a lease on a statutory ground; it no longer affords an independent basis for terminating a putative month-to-month tenancy.[3] This distinction, he argues, is legally significant, for it reveals that pre–1980 Act cases recognizing the common law waiver rule for month-to-month tenancies[4] are inapposite.

More specifically, he says, such cases are premised on an irrelevant analysis: that a 30–day notice to quit is itself legally suffi-

---

**2.** D.C.Code § 45–1561 (1981) provides in part:
Evictions.

(a) Except as provided in this section, no tenant shall be evicted from a rental unit, notwithstanding the expiration of his or her lease or rental agreement, so long as he or she continues to pay the rent to which the landlord is entitled for such rental unit. No tenant shall be evicted from a rental unit for any reason other than for nonpayment of rent unless he or she has been served with a written notice to vacate which meets the requirements of this section. Notices to vacate for all reasons other than for nonpayment of rent shall be served upon both the tenant and the Rent Administrator. All notices to vacate shall contain a statement detailing the reason(s) for the eviction. . . .
Section 45–1561(b) to –1561(i) enumerates the other grounds for eviction, including: a tenant's violation of an obligation of the tenancy (30–day notice to vacate); a tenant's performance of an illegal act within the rental unit (30–day notice to vacate); a good faith intention of the landlord to either occupy personally (90–day notice to vacate), renovate (120–day notice to vacate), or demolish the unit (180–day notice to vacate); and a contract in good faith to sell the unit (90–day notice to vacate).

**3.** The landlord is correct that the 1980 Act in effect creates, for all residential rental property in the District of Columbia, tenancies for a term of years, or periodic tenancies, terminable only on the occurrence of an event specified by statute (it does not, of course, create a life estate). *See Dunnington v. Thos. E. Jarrell Co.,* 96 A.2d 274, 275 (D.C.1953) (District of Columbia Emergency Rent Act (of 1941), codified, as amended,

at D.C.Code § 45–1605 (1951), converts "monthly tenanc[ies]" into "indeterminate tenancies"); RESTATEMENT (SECOND) PROPERTY, LANDLORD AND TENANT § 1.7 comment e (1977) (tenancy subject to a condition subsequent). Accordingly, although the District of Columbia Code retains provisions, enacted years earlier, recognizing periodic tenancies, *see, e.g.,* D.C. Code §§ 45–221, –1402 (1981) (month-to-month, quarter-to-quarter), as well as tenancies at will, D.C.Code §§ 45–222, –1403 (1981), or by sufferance, D.C.Code §§ 45–220, –1404 (1981), the 1980 Act in a number of ways supersedes them. We have ruled on several occasions that rent control statutes prevail over provisions adopted earlier that govern evictions, to the extent that the provisions conflict. *See Merriweather v. D.C. Bldg. Corp.,* 494 A.2d 1276, 1279 (D.C.1985) (D.C.Code § 45–1561 (1981) supersedes D.C. Code §§ 45–222, –1403 (1981)); *Adm'r of Veterans Affairs v. Valentine,* 490 A.2d 1165, 1170 (D.C.1985) (per curiam) (same); *Jack Spicer Real Estate, Inc. v. Gassaway,* 353 A.2d 288, 291–92 (D.C.1976) (D.C. Rent Control Reg. No. 74–20 § 10 supersedes D.C.Code § 45–904 (1973)); *Dunnington,* 96 A.2d at 275 (under 1941 Act, as amended, landlords whose "monthly tenanc[ies]" were converted into "indeterminate tenancies" have implied right to enter premises to prevent waste).

**4.** *See, e.g., Hamilton v. William Calomiris Investment Corp.,* 461 A.2d 466, 468 n. 2 (D.C.1983); *Rhodes v. United States,* 310 A.2d 250, 251 (D.C. 1973); *Dunnington,* 96 A.2d at 275 n. 2; *Shapiro v. Christopher,* 90 U.S.App.D.C. 114, 117, 195 F.2d 785, 789 (1952); *Byrne v. Morrison,* 25 App.D.C. 72, 75 (1905).

cient to terminate a month-to-month tenancy, that the tenancy therefore terminates upon expiration of the notice, and thus, that acceptance of rent for a future period must be interpreted as a waiver of the notice because (and only because) such acceptance creates a new term. *See supra* note 4. In contrast, says the landlord, the 1980 Act, by effectively creating an indeterminate tenancy, permits a landlord's notice to quit for breach of lease to survive the continued acceptance of rent, since such acceptance cannot be construed as a waiver of the notice (and the related breach) in the only manner justified at common law: creation of a new tenancy.

The landlord's argument is misplaced. It overlooks the more general body of law holding that acceptance of rent for a period extending after a breach of covenant[5] or after the expiration of a notice to quit— whether based on a breach[6] or on the expiration of a term[7]—may, or may not, amount to a waiver of the breach or termination, depending on the landlord's intent derived from all the circumstances. *See Kaiser v. Rapley,* 380 A.2d 995, 997 (D.C.

5. *Compare Walsh v. Cooper,* 31 A.2d 883, 884 (D.C.1943) (waived breach of covenant not to sublet), *with City Wide Learning Center, Inc. v. Wm. C. Smith & Co.,* 488 A.2d 1310, 1312–13 (D.C.1985) (did not waive breach of covenant restricting use of premises to commercial purposes), *and Shannon & Luchs Co. v. Tindal,* 415 A.2d 805, 806–07 (D.C.1980) (did not waive breach of no-pet covenant), *and Kaiser v. Rapley,* 380 A.2d 995, 997 (D.C.1977) (did not waive breach of covenant to pay rent when due), *and Klein v. Longo,* 34 A.2d 359, 360 (D.C.1943) (did not waive breach of covenant not to commit waste).

6. *See Woollard v. Schaffer Stores Co.,* 285 N.Y.S. 68, 74, 246 App.Div. 157, 163 (1936) (landlord waived breach of covenant against subletting by accepting rent "after the breach and after declaring forfeiture" through notice cancelling lease).

7. *Compare Edwards v. Totten,* 48 App.D.C. 416, 418–19 (1919) (waived notice to quit after expiration of one-year lease) (citing *Byrne* ) *and Donnelly Realty Co. v. Langevin,* 78 R.I. 333, 335, 82 A.2d 173, 175 (1951) (waived notice to quit after expiration of five-year lease), *with Rhodes,* 310 A.2d at 251 (did not waive notice to quit month-to-month tenancy).

1977); *In re Wil-Low Cafeterias,* 95 F.2d 306, 309 (2d Cir.), *cert. denied,* 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533 (1938).

Accordingly, even though the 1980 Act should be understood to create a tenancy for a term of years, or a periodic tenancy, terminable only on the occurrence of an event specified by statute—such as the violation of an obligation of the tenancy, D.C. Code § 45–1561(b), *supra* note 2—the common law rule is still applicable: "the receipt of rent by a landlord, after notice to quit, ... for a new term or part thereof, amounts to a waiver of his [or her] right to demand possession under that notice," *Byrne,* 25 App.D.C. at 75,[8] unless it is clear from all the circumstances that, by accepting rent from a holdover tenant, the landlord did not intend to waive an "expressed intention to enforce the lease." *Kaiser,* 380 A.2d at 997.[9] Nothing in the 1980 Act or its legislative history indicates that the Council of the District of Columbia has abrogated this common law rule which has long survived under periods of rent and housing controls. *See, e.g., Dunnington,* 96 A.2d at 274–75 & n. 2.

8. *Accord Insurance Company v. Norton,* 6 Otto 234, 242, 96 U.S. 234, 242, 24 L.Ed. 689 (1877) ("when a lease has become forfeited, any act of the landlord indicating a recognition of its continuance, such as ... accepting rent which accrued after the forfeiture, is deemed a waiver of the condition") (dicta); 3A THOMPSON ON REAL PROPERTY § 1360, at 695 (1981) ("[a] notice to vacate leased premises on a designated date is waived by the landlord accepting rent for tenure and use beyond that date").

9. In contrast, the acceptance of rent already in arrears at the expiration of a notice to quit does not affect a landlord's right to judgment for possession. *Shapiro,* 90 U.S.App.D.C. at 118, 195 F.2d at 789. Nor, in pursuing a forfeiture through a suit for possession, does a landlord waive the right to recover from a holdover tenant the reasonable rental value of the property during the pendency of the action—a matter typically addressed through a protective order requiring the tenant to make periodic payments into the court registry until the case has been resolved. *See generally Davis v. Rental Associates,* 456 A.2d 820 (D.C.1983) (en banc).

The question therefore becomes whether a landlord who receives rent tendered for a period after expiration of a notice to quit actually intends to accept it as such, see *Rhodes*, 310 A.2d at 251–52, and, if so, has implicitly waived the notice or, instead, has accepted the rent without prejudice by expressly reserving the right to enforce the notice to quit. *See Kaiser*, 380 A.2d at 997. These are questions of fact, *see Rhodes*, 310 A.2d at 252, with the landlord having the burden of rebutting the implication that, in receiving funds tendered as future rent, he intended to waive termination of the lease. *See In re Wil-Low Cafeterias*, 95 F.2d at 309. The trier's findings will not be disturbed on appeal unless plainly wrong or without evidentiary support. *See Rhodes*, 310 A.2d at 252; D.C.Code § 17–305(a) (1981).

In this case, there is no provision in the lease stating that acceptance of rent for a period after a breach, or after expiration of a related notice to quit, does not waive the landlord's option to terminate. Moreover, the landlord concedes that the "December rent ... was subsequently paid." At the time the tenant tendered the money order for the December rent, the landlord did not disclaim his intention to accept it as such, let alone express his intention to reserve the right, under the notice to quit, to terminate the lease for overcrowding. *Compare Donnelly Realty Co.*, 78 R.I. 333, 335, 82 A.2d 173, 175 (1951) (no evidence that landlord, by unqualifiedly accepting rent in advance on date notice to quit was to become effective, did not intend to waive notice), *with Rhodes*, 310 A.2d at 251–52 (no intent to accept rent and thus no waiver of right to demand possession where landlord's agent cashed tenant's money order tendered as rent for term beyond expiration of notice to quit).

Accordingly, the trial court did not err in finding that the landlord, in accepting the rent for December, had waived the notice to quit and the alleged breach (overcrowding) pertaining to the rental period expiring November 30. We affirm the trial court's dismissal of the complaint for possession, as well as its summary judgment for the tenant.

### III.

#### A.

The landlord next challenges the court's award of attorney's fees to the tenant pursuant to Super.Ct.Civ.R. 37(a)(4).[10] On December 19, 1983, the tenant submitted written interrogatories to the landlord. The landlord filed answers on January 30, 1984 but failed to respond to interrogatories 3, 7, 9 and 10.

Interrogatory 3 requested information on the levels of rent charged throughout the tenancy. The landlord objected to this question as "[i]rrelevant, [since the landlord] has dismissed its claim for rent in the pending action." In fact, however, he did not dismiss his claim for possession based on nonpayment of rent until March 1984, over a month later. Nor did the landlord object to the relevance of this interrogatory to the tenant's counterclaim, which was still pending.

Interrogatories 7, 9 and 10 addressed the condition of the premises dating from the inception of the tenancy. They asked the landlord to describe repairs made within the apartment, to state reasons for repairs not made, and to recount complaints received from the tenant. The landlord answered these questions but limited his responses to the period after January 1, 1983, the approximate date of an earlier default

10. Super.Ct.Civ.R. 37(a)(4) provides in part:
Award of expenses of motion [to compel discovery]. If the motion is granted, the Court shall, after opportunity for hearing, require the party ... to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.

judgment for possession he had obtained against the tenant.[11]

In February 1984, the tenant moved to compel the landlord to furnish complete answers to these four interrogatories. She also moved for an award of attorney's fees incurred in preparation of the motion to compel. The landlord filed no written opposition to either motion.

The parties appeared for a hearing on the tenant's motion to compel on February 14, 1984. The landlord's counsel, citing *Davis v. Bruner*, 441 A.2d 992 (D.C.), *vacated per curiam, id.* at 1000 (1982), *judgment aff'd*, 470 A.2d 1248 (1984) (as amended), argued that the earlier default judgment constituted an adjudication on the condition of the premises before 1983 and, accordingly, that *res judicata* barred any defense based on housing code violations before 1983. This, he said, precluded any obligation to respond to interrogatories 7, 9, and 10. Counsel proffered no explanation, however, for the landlord's failure to answer interrogatory 3.

The tenant's counsel reminded the court that she had raised a defense of retaliatory eviction to the landlord's complaint for possession. She argued that discovery of the tenant's complaints about defective conditions for the entire period of the tenancy was therefore relevant to preparation of this defense, based on the landlord's motive, without regard to whether *res judicata* barred litigation of these conditions for purposes of recovering a rent rebate.

The court granted the tenant's motion to compel as to all four interrogatories. Thereupon, the tenant's counsel renewed her request for attorney's fees, without objection from the landlord. The court awarded her $100. The landlord later filed a "motion to vacate order granting sanctions," which the court denied.

### B.

On appeal, the landlord contends, without elaboration, that his refusal to answer interrogations 7, 9 and 10 was "substantially justified," Super.Ct.Civ.R. 37(a)(4), *supra* note 10, and, in any event, that the court erred in awarding attorney's fees to the tenant without a hearing. We reject these contentions.[12]

### 1.

Rule 37(a)(4) provides that, if a motion to compel is granted, "the court shall, after opportunity for hearing, require the party ... to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the Court finds that the opposition to the motion was substantially justified...." *Supra* note 10. Thus, in the absence of substantial justification for a refusal to comply, "the award of expenses is mandatory against a party whose conduct necessitated a motion to compel discovery...." *Merritt v. International Brotherhood of Boilermakers*, 649 F.2d 1013, 1019 (5th Cir. 1981) (construing Fed.R.Civ.P. 37(a)(4)).[13]

---

11. The parties agree that the landlord had obtained this default judgment on November 23, 1982. According to the landlord, this judgment "la[id] to rest the condition of the premises through that time."

12. The landlord also challenges the propriety of awarding attorney's fees to Neighborhood Legal Services, a publicly funded organization which provides free legal services for its clients. This contention is frivolous. *Martin v. Tate*, 492 A.2d 270, 274 (D.C.1985); *see generally Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

13. The Advisory Committee Note to the 1970 amendment of Fed.R.Civ.P. 37(a)(4) provides

that "expenses should ordinarily be awarded unless a court finds that the losing party acted justifiably in carrying his point to court." *Accord Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir.1982); 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2288, at 789 (1970) ("Rule 37(a)(4) ... requires an award against a party unless his [or her] position 'was substantially justified.' Thus the burden of persuasion is ... on the losing party to avoid assessment of expenses and fees....")

Super.Ct.Civ.R. 37(a)(4) is "substantially identical to Federal Rule of Civil Procedure 37." Super.Ct.Civ.R. 37 comment. Superior Court rules must be construed consistently with the Federal Rules. *Floyd v. Leftwich*, 456 A.2d 1241, 1245 n. 4 (D.C.1983).

"Opposition to a motion is 'substantially justified' if the motion raised an issue about which reasonable [persons] could genuinely differ on whether a party was bound to comply with a discovery rule." *Smith v. Montgomery County*, 573 F.Supp. 604, 614 (D.Md.1983), *appeal dismissed*, 740 F.2d 963 (4th Cir.1984); *accord Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.*, 54 F.R.D. 551, 553–54 (S.D.N.Y.1972); Fed. R.Civ.P. 37(a)(4) advisory committee note ("On many occasions, ... the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court. In such cases, the losing party is substantially justified in carrying the matter to court."). *Cf. Reygo Pacific Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir.1982) (request for discovery substantially justified "if reasonable people could differ as to whether the party requested must comply").

The trial court, however, has discretion to evaluate the justification proffered. *See Floyd v. Leftwich*, 456 A.2d 1241, 1244 (D.C.1983); *accord Marquis v. Chrysler Corp.*, 577 F.2d 624, 642 (9th Cir.1978); *cf. In re Multi-Piece Rim Products Liability Litigation*, 209 U.S.App.D.C. 416, 425, 653 F.2d 671, 680 (1981) (determination whether motion to compel discovery is substantially justified "is committed to the sound discretion" of the trial court).

 In determining whether the trial court abused its discretion by concluding that the landlord had no substantial justification for refusing to provide the requested answers, we must evaluate whether the interrogatories were relevant to any of the tenant's defenses or to the counterclaim, since neither the landlord's claim for nonpayment of rent nor the tenant's counterclaim had been dismissed by consent praecipe at the time of the motion to compel or of the subsequent hearing.

The tenant alleged in her answer to the landlord's complaint that "[t]he instant action is in retaliation against [tenant] for prior complaints direct[ed] to [landlord] concerning the unsafe or unsanitary conditions existing on the subject premises" and for "prior complaints to the District of Columbia Department of Licenses and Inspections...." *See Golphin v. Park Monroe Associates*, 353 A.2d 314, 318 (D.C.1976) ("the states' judicial processes may not be used to accomplish an eviction for retaliatory purposes") (emphasis omitted); *Edwards v. Habib*, 130 U.S.App.D.C. 126, 129, 397 F.2d 687, 690 (1968) ("proof of a retaliatory motive does constitute a defense to an action of eviction"), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969); D.C.Code § 45–1562 (1981) ("retaliatory action"), *recodified at* D.C.Code § 45–2552 (1981, Replacement Vol. 1986).

The tenant's interrogatory 7 asked in part: "[s]ince the inception of [her] tenancy, have you received any oral or written complaints from [the tenant] regarding conditions in [her] apartment?" Interrogatories 9 and 10 sought to discover the landlord's responses to these complaints. These questions clearly related to the retaliatory eviction "defense of the party" seeking discovery, and thus were "relevant to the subject matter involved in the pending action." Super.Ct.Civ.R. 26(b)(1); *see* D.C. Code § 45–1562(b)(1) (1981), *recodified at* D.C.Code § 45–2552(b)(1) (1981, Replacement Vol. 1986).

In attempting to prove that the "landlord who seeks to evict her harbors a retaliatory intent," *Edwards*, 130 U.S.App.D.C. at 129, 397 F.2d at 690, the tenant must prove that the landlord intended to evict her because of her complaints about code violations, but she need not prove the alleged violations themselves. *See* D.C.Code § 45–1562(b) (1981), *recodified at* D.C.Code § 45–2552(b) (1981, Replacement Vol. 1986). Thus, even if the landlord were correct in asserting that the November 1982 default judgment for possession precluded the tenant from asserting a counterclaim for overpayment of rent based on earlier housing code viola-

tions,[14] the tenant was still entitled to litigate a defense of retaliatory eviction based on her complaints about such violations from the beginning of the tenancy, for the greater the number of complaints over a long period, the more likely a trier of fact would be to infer retaliatory motive.[15]

Accordingly, even if we assume, for the sake of argument, that the landlord was substantially justified in believing that *res judicata* barred the tenant's counterclaim for excessive rent, *see supra* note 14, there was no such bar against the tenant's effort to prove retaliatory motive for the present

**14.** The landlord's claim of justification for refusal to answer, based on this argument, presents a more difficult question. In *Davis v. Bruner,* 441 A.2d 992 (D.C.), *vacated per curiam, id.* at 1000 (1982), *judgment aff'd,* 470 A.2d 1248 (1984) (as amended), a division of this court affirmed a trial court ruling that a tenant may not raise, as an affirmative defense to an action for possession, housing code violations that predated an earlier default judgment in the landlord's favor. 441 A.2d at 998. This court, sitting en banc, later vacated the panel's opinion and ordered the case reheard. On September 30, 1983, the en banc court affirmed the judgment on appeal by per curiam order (published in our slip opinion series but not in West) stating that opinions would follow, thus adopting without elaboration the result reached by the original panel. Therefore, when the landlord submitted his interrogatory responses in January 1984 limiting his discussion of alleged housing code violations to the period following the earlier default judgment, "reasonable [persons] could differ" *Reygo Pac. Corp.,* 680 F.2d at 649, as to whether information about pre-existing violations were "relevant to the subject matter involved in the pending·action...." Super.Ct.Civ.R. 26(b)(1). Accordingly, had the tenant raised only defenses and counterclaims based on housing code violations, the landlord may have been substantially justified in limiting his answers. As it turned out, the mystery of this court's views on the *Davis* issues deepened after the trial court ruled on the attorney's fees issue here. On February 8, 1984, the en banc court issued an amended order in *Davis* stating, without opinions, that "the judgment on appeal is affirmed by an equally divided court." 470 A.2d at 1248.

**15.** D.C.Code § 45–1562(b) (1981), *recodified at* D.C.Code § 45–2552(b) (1981, Replacement Vol. 1986) provides in relevant part:

(b) In determining whether an action taken by a landlord against a tenant is retaliatory action, the trier of fact shall presume retaliatory action has been taken, and shall enter judgment in the tenant's favor unless the landlord comes forward with clear and convincing evidence to rebut this presumption: Provided, that within the 6 months preceding such landlord's action, the tenant: [has requested the landlord to make repairs necessary for "compliance with the housing regulations," has re-

ported "existing" or "suspected" code violations to District government officials, etc.]. This "presumption" provision of the 1980 Act (retained in the Rental Housing Act of 1985) accordingly strengthened the following ·language contained in both the Rental Accommodations Act of 1975, D.C.Code § 45–1654(b) (Supp.1976), and the Rental Housing Act of 1977, D.C.Code § 45–1699.7(b) (Supp.1980), where the burden of persuasion remained with the tenant: "In determining whether an action taken by a landlord against a tenant is retaliatory action, the trier of fact shall take into consideration whether, within the six (6) months preceding such landlord's action, the tenant: ...."

None of the three statutes has addressed the implications of allegedly retaliatory action taken more than six months after the tenant's last complaint. The legislative history, moreover, is silent on this question. *See* Report, Council of the District of Columbia, Committee on Housing and Economic Development, Bill 3–321, "The Rental Housing Act of 1980," October 23, 1980; *see also* Report, Council of the District of Columbia, Housing and Urban Development Committee, Bill 1–157, "Rental Accommodations Act of 1975," July 31, 1975; Report, Council of the District of Columbia, Committee on Housing and Urban Development, Bill 2–152, "Rental Housing Act of 1977," September 22, 1977; Memorandum, Council of the District of Columbia, from Chairperson, Committee on Government Operations, Bill 2–158, "District of Columbia Housing Assistance Act of 1977, May 13, 1977."

We construe § 45–1562(b) of the 1980 Act, which was retained in the Rental Housing Act of 1985, D.C.Code § 45–2552(b) (1981, Replacement Vol. 1986), to permit a tenant—in at least one situation—to introduce evidence of code violation complaints more than six months before the landlord's allegedly retaliatory action: where the tenant has complained within six months and the tenant seeks to buttress the retaliatory motive argument against the landlord by showing earlier complaints as well. We do not address the question whether the statute precludes a tenant from claiming retaliatory action (and assuming the burden of persuading the trier of fact) when a landlord acts more than six months after the last tenant complaint.

In this case, at the discovery stage, the tenant's interrogatories were entirely proper.

effort to evict her, based on her complaints since the inception of the tenancy. Any preclusion of a rent overpayment claim derived from the November 1982 default judgment cannot be said to have resolved, preclusively, the issue of the landlord's present motive to evict, since that issue could not have been "essential to the judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). The landlord therefore had no substantial justification for refusing to answer questions 7, 9, and 10.

■ Interrogatory 3, which requested information regarding the various rent levels charged since the inception of the tenancy, was apparently intended to aid the defendant's counterclaim for alleged overpayment of rent. This interrogatory, therefore, also sought matter discoverable under Rule 26(b)(1). The landlord made no effort to explain his refusal to answer; he did not even attempt to limit his response to the period after the November 1982 default judgment on the ground that the tenant was barred from litigating earlier rent charges. In the absence of any asserted justification for his refusal to answer, the landlord was required to answer or face sanctions for failure to do so.

In sum, the information sought in interrogatories 3, 7, 9 and 10 was discoverable under Rule 26(b)(1). The trial court, therefore, did not abuse its discretion in awarding attorney's fees under Rule 37(a)(4), after granting the motion to compel, since the landlord proffered no substantial justification for refusing to answer.

### 2.

■ The landlord also argues that the court erred in granting the tenant's motion for attorney's fees and expenses without an evidentiary hearing. We disagree.

Rule 37(a)(4) provides that a court shall award expenses of a motion to compel to a successful movant "after opportunity for hearing." Courts have held, however, that this requirement may be satisfied by allowing both parties to express their positions to the court in writing. *Persson v. Faestel Investments, Inc.,* 88 F.R.D. 668, 670 (N.D.

Ill.1980); *Addington v. Mid-American Lines,* 77 F.R.D. 750, 752 n. 1 (W.D.Mo. 1978); *see also Hayden Stone, Inc. v. Brode,* 508 F.2d 895, 897 (7th Cir.1974). We conclude that the landlord had an adequate opportunity to oppose the tenant's motion and may not now complain that the trial court failed to hold a separate evidentiary hearing.

The tenant's motion to compel discovery specifically requested an award of expenses incurred in preparation. The landlord failed to file a written opposition to this motion. When the tenant raised the matter in the subsequent hearing on her motion to compel, the landlord again had the opportunity to object and state his position; he failed to do so. The court, however, thoroughly explored the interrogatories at issue to determine whether the landlord's refusal to answer was substantially justified before granting the tenant's motions. Not until after the award of attorney's fees did the landlord file a "motion to vacate order granting sanctions" challenging the court's failure to hold a separate hearing. After still another hearing, the court denied his motion. Under these circumstances, we are satisfied the court discharged its obligation to provide the landlord with an opportunity to be heard. Accordingly, we affirm the trial court's award of attorney's fees and expenses.

### IV.

Finally, the landlord contends that the trial court erred in releasing to the tenant the $680 she had paid into the court registry under a protective order during the course of the litigation.

### A.

On March 14, immediately after the court had ruled on the summary judgment motions, the tenant asked the court to release the funds in the registry to her. Relying on several Superior Court decisions, she argued that, "[w]hen a [tenant] prevails on a summary judgment motion, it is the prac-

tice of this Court to release those [registry] monies to [her]," since the protective order "serves the purpose of protecting ... a plaintiff who prevails in a suit in this branch of the Superior Court." After argument, and at the tenant's request, the court agreed to delay ruling on the disposition of the funds until after the parties had submitted briefs.

Both parties did so in late March. The tenant elaborated her earlier argument; the landlord maintained, as he does on appeal, that "[i]n dismissing her counterclaims and claims for abatement of rent" (without prejudice), the tenant "has conceded that she had no interest in the monies paid into the registry of the Court, since she had used and occupied the premises during [that] period...." Accordingly, "no further hearing is necessary to determine who is entitled to the money."

The trial court, in a memorandum order referring to the landlord's dismissal of his claim for nonpayment of rent, released the funds to the tenant. The court observed that "[t]he character of [the landlord-tenant] relationship takes on a distinctly unequal pallor when the [landlord], having nonsuited himself on the merits, then asks the court to dis[burse] to him the [tenant's] monies entered into the Registry of the court in good faith."

After the trial court's order, this court issued its decision in *Temple v. Thomas D. Walsh, Inc.*, 485 A.2d 192 (D.C.1984), rejecting the Superior Court decisions on which the tenant had relied. We ruled that "a disposition favorable to the tenant in the underlying landlord-tenant action does not preclude the trial court ... from releasing to the landlord any funds which the tenant may have deposited into the registry of the court" when the tenant has offered no evidence warranting a rent abatement. *Id.* at 194.

On appeal, the tenant's counsel notes that in *Temple* we held that the trial court, after a hearing under *McNeal v. Habib*, 346 A.2d 508 (D.C.1975), "acted well within its discretion as a court of equity in releasing

the funds in the registry to the landlord." *Temple*, 485 A.2d at 194. Counsel urges us to rule that, in the present case, the trial court did not abuse its discretion in awarding the funds to the tenant. Alternatively, counsel argues, in derogation of *Temple*, that the trial court actually had no equitable discretion to award the funds to the landlord because a claim for unpaid rent is legal in nature, the landlord has an adequate remedy at law (a civil action) for pursuit of arrearages, and the tenant correspondingly has a right to a jury trial in the event that the matter has to be litigated. *See Dameron v. Capitol House Associates Ltd.*, 431 A.2d 580, 584 (D.C.1981) (dicta).

As of the time of disbursement, the tenant had withdrawn her counterclaim, as well as her defenses to the landlord's dismissed claim for nonpayment of rent. Thus, she had no pending claim or defense which would have entitled her to an abatement of the rent (or, if she were deemed a holdover tenant, an abatement of the amount found to be the reasonable value of the apartment during her continued occupancy). As elaborated below, the absence of such a claim or defense is dispositive in the landlord's favor here.

**B.**

We have often observed that a protective order is an "equitable tool" designed to protect both parties during the pendency of a landlord-tenant action. *Dameron*, 431 A.2d at 583; *accord Temple*, 485 A.2d at 193; *Davis v. Rental Associates, Inc.*, 456 A.2d 820, 823 (D.C.1983) (en banc) (plurality opinion); *Mahdi v. Poretsky Management, Inc.*, 433 A.2d 1085, 1090 (D.C.1981) (per curiam). This device protects the tenant from falling further in arrears and risking forfeiture of her lease, *Dameron*, 431 A.2d at 583 n. 4, 584; *McNeal*, 346 A.2d at 512, and " 'provides a fund from which the tenant may receive an abatement if housing code violations ... are ... found.' " *Temple*, 485 A.2d at 193 (quoting *Dameron*, 431 A.2d at 584). The landlord, however, "is entitled to judicial protection of his fair

compensation 'for the possession he loses during the period of litigation.'" *Damer-on*, 431 A.2d at 584 (citations omitted); *accord Temple*, 485 A.2d at 194. Payment of funds into the registry thus assures that, at the conclusion of the proceedings, the landlord will receive the reasonable value of the premises during tenant's continued occupancy. *See Temple*, 485 A.2d at 193; *Mahdi*, 433 A.2d at 1088.

More specifically, at the conclusion of a possessory action, "the court has an obligation, irrespective of the outcome of that action, to distribute in an equitable fashion, any funds deposited in the court registry pursuant to the protective order." *Temple*, 485 A.2d at 193. If the tenant alleges substantial housing code violations entitling her to an abatement of rent and the "proportionate rights of the parties" were not settled in the underlying possessory action, the court must hold an evidentiary hearing to determine what portion of the payment otherwise due should be abated. *City Wide Learning Center, Inc. v. William C. Smith & Co.*, 488 A.2d 1310, 1314 (D.C.1985); *Goodwin v. Barnes*, 456 A.2d 1246, 1247 (D.C.1983); *McNeal*, 346 A.2d at 514; *see also Smith v. Interstate General Corp.*, 462 A.2d 1133, 1134 n. 3 (D.C.1983). Such a hearing "is solely for the purpose of examining evidence of housing code violations or other defects...." *Goodwin*, 456 A.2d at 1247.

In *Temple*, a landlord sued his tenant for possession after serving a thirty day notice to quit. The tenant moved to dismiss on the ground that the notice to quit was invalid. The court granted the motion. Both parties sought release of funds paid into the court registry pursuant to a protective order. During a hearing on the issue, the tenant argued—as the tenant

does here—that she was entitled to the funds because she had prevailed in the underlying action for possession. The landlord countered that the tenant had enjoyed full use of the property during the pendency of the action and thus that the funds should be released to the landlord. The trial court agreed with the landlord. 485 A.2d at 193.

We affirmed, observing that "[t]here can be no doubt that the landlord had a right to be compensated in some measure for the tenant's use and enjoyment of [the] property" and that "[t]he disbursement of [registry] funds often depends on factors not at issue (or not resolved) in the underlying action, particularly the presence or absence of housing code violations which might entitle the tenant to a reduction in rent." *Id.* at 194. Because the tenant in *Temple* had failed to "offer any evidence which would warrant a reduction in the amount of rent due under her lease," we concluded that the court acted properly in releasing the funds to the landlord. *Id.; accord City Wide Learning Center, Inc.*, 488 A.2d at 1314.

This case is indistinguishable from *Temple*. At the time the court granted the tenant's summary judgment motion, she had voluntarily dismissed all defenses, as well as her counterclaim, based on housing code violations. Therefore, whether the tenant's payments into the registry should be characterized as "rent" due under a subsisting tenancy, or characterized instead as the reasonable value of the premises during her continued use (the description commonly used for payments due from a holdover tenant), she had asserted no claim tending to show that the landlord was entitled to less than the amount paid into the registry.[16] Accordingly, "[w]here,

16. Presumably, when a tenant prevails in a possessory action under an unexpired lease, as we have here under the circumstances, *see supra* note 3, the tenant is still in possession under the lease and thus the payments into the registry under a protective order are properly characterized as "rent" after the right to possession is confirmed. If, however, the landlord prevails

on a notice to quit, the tenant will have been in possession, after the notice expired, in the status of a holdover tenant. In that case, the landlord will be entitled not to the rent specified in the expired lease but to the reasonable value of the premises during the tenant's continued occupancy. This, theoretically, can be more or less than the rent specified in the lease. Typically, how-

as here, ... no entitlement to an offset is even alleged, the court may properly release the funds in the registry to the landlord without an evidentiary hearing." *City Wide Learning Center, Inc.*, 488 A.2d at 1314 (citation omitted).

The trial court accordingly erred, as a matter of law, in releasing the funds to the tenant. When this court in *Temple* referred to the trial court's action as "well within its discretion as a court of equity in releasing the funds in the registry to the landlord," 485 A.2d at 194, we were not suggesting that, absent an issue of abatement requiring adjudication of the equities, the court has discretion, nonetheless, to release the funds to the tenant. This is not a determination committed to trial court discretion; rather, it is a determination subject to rules of law "that fi[x] the results produced under varying sets of facts." *Johnson v. United States*, 398 A.2d 354, 361, 363 (D.C.1979). We therefore must reverse and remand for entry of a judgment in favor of the landlord in the amount of the funds the tenant paid into the registry.[17]

We note, as a postscript, that because the tenant dismissed her counterclaim without prejudice, she is free to pursue it in a separate judicial proceeding. *Davis*, 456 A.2d at 829–30; *Mahdi*, 433 A.2d at 1089–90; *Hsu v. Thomas*, 387 A.2d 588, 589 (D.C.1978) (per curiam). We express no opinion on the preclusive effect of the November 1982 default judgment obtained by the landlord. *See generally Davis v. Bruner, supra* note 13.

*Affirmed in part, reversed in part, and remanded.*

## ON PETITION FOR REHEARING

In Part II of our original opinion, we affirmed dismissal of the landlord's complaint for possession and affirmed summary judgment for the tenant. We held the trial court did not err in finding that the landlord, by accepting rent for December 1983 without a reservation of rights, "had waived the notice to quit and the alleged breach (overcrowding) pertaining to the rental period expiring November 30." *Habib v. Thurston*, 517 A.2d 1, 7 (D.C. Oct. 11, 1985). In Part III, we affirmed the court's award of attorney's fees and expenses to the tenant in connection with her motion to compel answers to interrogatories.

In Part IV of our opinion, however, we held that, although the tenant had prevailed, the trial court erred as a matter of law in releasing funds to the tenant which she had paid into the court registry under a protective order, in the amount of the monthly rent, pending the outcome of the landlord's action. We reversed and remanded "for entry of a judgment in favor of the landlord in the amount of the funds the tenant paid into the registry." At 14 (footnote omitted).

The tenant seeks rehearing of our Part IV ruling. She contends we erroneously deprived her of the right to a *McNeal*[1]

ever, such reasonable value is determined, presumptively, by the rent the tenant had been paying. Unless the parties have validly agreed otherwise in the lease, "[i]n the absence of evidence that the rental value of the leased property has increased or diminished since negotiation of the rent at the time of agreement to lease, that negotiated rental rate will determine the rate a which the holdover must pay for his [or her] continued use and occupation," *Restatement (Second) of Property, Landlord and Tenant* § 14.5 COMMENT A (1977).

**17.** Because we conclude that the court need not have held an evidentiary hearing, *see generally City Wide Learning Center, Inc.*, 488 A.2d at

1314; *Goodwin v. Barnes*, 456 A.2d 1246, 1247 (D.C.1983); *Smith v. Interstate General Corp.*, 462 A.2d 1133, 1134 n. 3 (D.C.1983), we need not reach the tenant's contention that the court may not adjudicate the parties' respective claims to funds in the court registry, at a *McNeal* hearing, without affording the right to a jury trial. Quite simply, because of the posture of this case at the time of disbursement, there was nothing left to adjudicate; "there were no material facts in issue to submit to a jury." *Brown v. Young*, 364 A.2d 1171, 1174 n. 5 (D.C.1976) (citations omitted).

**1.** *McNeal v. Habib*, 346 A.2d 508 (D.C.1975).

hearing on the disbursement of the funds in the registry. She also asserts a constitutional right to a jury at the *McNeal* hearing, an issue we did not address given our disposition in Part IV. At 14 n. 17. We grant rehearing and rule for the tenant on both issues.

**I.**

In his complaint, the landlord had alleged a right to possession based both on a notice to quit and on nonpayment of rent. The day before the hearing, however, the parties executed the following praecipe:

> [B]y consent of the parties, plaintiff dismisses his claim for possession based upon nonpayment of rent. Defendant dismisses without prejudice her counterclaims. Plaintiff's suit for possession based upon alleged overcrowding and defenses thereto survive this praecipe.

The parties' clear intention, therefore, was to limit the proceeding to a possessory action based on a notice to quit (commonly called a "notice case"), and thus to limit the tenant to the corresponding defenses.

As a consequence, all the tenant's defenses and counterclaims premised on proof of housing code violations—commonly called *Brown*[2] and *Javins*[3] defenses—dropped out of the case. As we said over a decade ago, "a defense of housing code violations is irrelevant to a possessory action based upon a valid 30–day notice to quit (unless raised in the context of a claim of retaliatory eviction)." *McNeal v. Habib,* 346 A.2d 508, 514 (D.C.1975); *accord Brown v. Young,* 364 A.2d 1171, 1173 (D.C. 1976). The retaliatory eviction exception is irrelevant here. Because that defense is based only on a tenant's complaints about code violations—proof of code violations themselves is not required, at 9 a retaliatory eviction cannot serve as the basis for a rent abatement.

We concluded, therefore, that the tenant "had no pending claim or defense which would have entitled her to an abatement of the rent." At 12. She had preserved "no claim tending to show that the landlord was entitled to less than the amount paid into the registry. Accordingly, '[w]here, as here, ... no entitlement to an offset is even alleged, the court may properly release the funds in the registry to the landlord without an evidentiary hearing.' *City Wide Learning Center, Inc.,* 488 A.2d at 1314 (citation omitted)" (footnote omitted). At 13–14.

We added that, because the tenant had dismissed, without prejudice, her counterclaim based on housing code violations, she was "free to pursue it in a separate judicial proceeding." At 14 (citations omitted).

**II.**

On petition for rehearing, the tenant faults our analysis in several respects. First, she claims she "had not withdrawn her defenses relating to the condition of the premises but, rather, had withdrawn only her counterclaim based upon housing code violations." Specifically, she points to her *Brown* defense, her recoupment defense based on *Javins,* and her retaliatory eviction defense. Apparently, she believes these defenses survived the praecipe for purposes of the protective order, if not the notice case. We disagree.

As indicated earlier, both the *Brown* defense[4] and the recoupment defense based

---

**2.** *Brown v. Southall Realty Co.,* 237 A.2d 834, 836–37 (D.C.1968) (lease void as matter of law, and thus claim for rent arrearage fails, because landlord knew at inception of tenancy there were housing code violations).

**3.** *Javins v. First National Realty Corp.,* 138 U.S. App.D.C. 369, 428 F.2d 1071, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) (housing code violations arising during tenancy breach warranty of habitability and thus may

serve as defense to possessory action for nonpayment of rent and provide basis for abatement of rent claimed due).

**4.** *Brown, supra* note 2, which nullified rent arrearages under a void lease, is irrelevant as a defense to a notice to quit for alleged overcrowding of the premises under a lease the tenant seeks to affirm and enforce.

on *Javins*[5] addressed only the landlord's claim for nonpayment of rent. Both defenses lapsed with the landlord's voluntary dismissal of that claim before the trial court heard the parties' cross-motions for summary judgment on the landlord's notice case. Moreover, as previously explained, the tenant's retaliatory eviction defense, while applicable to a notice to quit, provides no basis for a rent abatement.

▇ In any event, because all these defenses were directed only at the period ending with the return date,[6] they were not legally relevant to the tenant's payment of funds into the registry in lieu of rent for the months thereafter or to the eventual disbursement of those funds.[7]

In sum, if the tenant is entitled to a *McNeal* hearing at which she can assert *Javins* defenses, that right must exist independently of her answer to the possessory action.

### III.

The tenant does not really dispute the foregoing analysis. After asserting that she had withdrawn only her counterclaim,

not her code violation defenses, *supra* Part II., she shifts her position by acknowledging in the petition for rehearing that *Javins* defenses are not permitted in a "pure notice case," which this proceeding had become. *See* Super.Ct. L & T R. 5(b).[8] Implicitly, therefore, she concedes that after the praecipe dismissing the nonpayment claim had been filed, all her allegations about code violations affecting the rent level had, in effect, been stricken.

▇ We thus have strictly a notice case in which the court entered a protective order in the amount of the monthly rent under the lease.[9] The tenant prevailed. The question, then, is: whether a tenant whose pleadings do not—and by court rule cannot—invoke code violations as a defense or counterclaim in a notice case is entitled, nonetheless, to a *McNeal* hearing to contest, on the basis of alleged code violations, the landlord's right to the sums in the registry representing the rent due under the lease for the period the case was in court.

In Part IV of our original opinion we answered "no"; the landlord is entitled to

---

**5.** The tenant directed her recoupment defense at "the total amount of rent found to be due and owing herein." This defense therefore refers only to abatement of the December 1983 rent claimed due. Because it is a *Javins* defense to alleged nonpayment of rent, *supra* note 3, it is irrelevant to an action for possession based on a notice to quit for alleged overcrowding.

**6.** According to the docket entries, the answer was filed on the return date and the protective order was entered immediately thereafter on the same day.

**7.** There is no record evidence that the tenant, on the basis of code violations listed in her answer, sought to make payments into the registry in an amount less than the rent due under the lease.
As a matter of law, moreover, all payments under a protective order pertain only to months of the litigation period; even when a landlord claims nonpayment of rent, payments into the registry are not obtainable for, or allocable to, back rent. *Bell v. Tsintolas Realty Co.*, 139 U.S.App.D.C. 101, 110, 430 F.2d 474, 483 (1970).

**8.** Super.Ct. L & T R. 5(b) provides:
*Counterclaims.* In actions in this Branch for recovery of possession of property in which the basis of recovery is nonpayment of rent or

in which there is joined a claim for recovery of rent in arrears, the defendant may assert an equitable defense of recoupment or set-off or a counterclaim for a money judgment based on the payment of rent or on expenditures claimed as credits against rent or for equitable relief related to the premises. No other counterclaims, whether based on personal injury or otherwise, may be filed in this Branch. This exclusion shall be without prejudice to the prosecution of such claims in other Branches of the Court.

**9.** In *Cunningham v. Phoenix Management, Inc.*, No. 85–1037, *appeal pending*, the trial court entered a protective order in a landlord's action for possession based solely on a notice to cure or quit. There was no allegation that the tenant was behind in her rent. *Cunningham* presents the question whether the court, in a strictly notice case, lawfully can order a tenant to make payments into the registry in lieu of rent while the case is pending, since allegedly there can be no showing of "obvious need" for a protective order when nonpayment of rent is not an issue. *Bell*, 139 U.S.App.D.C. at 111, 430 F.2d at 484; *see id.* at 106, 430 F.2d at 479.

that money—to the contracted rent—as a matter of law. The tenant, on rehearing, says we were wrong. She argues that Part IV in effect requires a tenant, in derogation of Super.Ct. L & T R. 5(b), *supra* note 8, formally to plead *Javins* defenses to a complaint based on a notice to quit, in order to preserve the right to a post-trial evidentiary hearing under *McNeal.* We understand the tenant to mean, more specifically, that Part IV has two implications: either we have (1) legitimated in a notice case—and required—a formally pleaded *Javins* defense (presumably by an amended answer) directed at the litigation period, in order to receive a *McNeal* hearing at the end of the proceeding; or we have (2) held, in effect, that *Javins* defenses are never available to challenge disbursement of registry funds to the landlord in a notice case, and that if a tenant wishes to assure her payments into the registry remain undispersed to the landlord pending the tenant's assertion of code violations as an offset, the tenant must file a separate rent abatement claim in the Small Claims Branch or in the Civil Division with the hope of arranging an extension of the protective order until both claims are resolved. We acknowledge that our opinion is susceptible of either interpretation.

The tenant suggests that neither alternative is valid. The first, she says, violates Super.Ct. L & T R. 5(b), since a *Javins* defense may not be formally pleaded in a notice case tried in the Landlord and Tenant Branch. The second alternative, she adds, is too unwieldly, if not altogether unworkable, insofar as it would require the tenant not only to file a separate claim in another branch or division of the court but also to trust that the Landlord and Tenant Branch would continue the protective order to preserve her rights.

The tenant argues that the proper approach, instead, is to recognize (1) that issuance of a protective order reflects " 'a separate and distinct equitable proceeding, not part of the underlying possessory action,' " *Temple v. Thomas D. Walsh, Inc.,* 485 A.2d 192, 194 (D.C.1984) (quoting *Smith v. Interstate General Corp.,* 462 A.2d 1133, 1134 (D.C.1983)); (2) that this separate proceeding looks prospectively, addressing rights during the litigation period, in contrast with the retrospective analysis applicable to the possessory action itself; (3) that although, under Landlord and Tenant Branch rules, an answer alleging code violations is not permitted in a notice case, those rules do not preclude an oral [10] *Javins* defense to the landlord's request for disbursement of the funds in the registry attributable to this separate proceeding; and (4) that *McNeal* itself recognizes the consistency, as well as the constitutional necessity, of such a post-trial hearing on code violations during the litigation period of a notice case, even though a *Javins* defense is irrelevant to the possessory action itself.

We believe the tenant's critique, on rehearing, is persuasive; the analysis in Part IV of our original opinion was wrong. In *McNeal*—exclusively a notice case—this court noted, as we have earlier in this opinion, that the tenant's code violation defenses were irrelevant because the landlord had not alleged nonpayment of rent. The court added, however, that once a tenant demands a trial on the return date, "future payments of rent (or perhaps more accurately payments for the continued use or occupancy of the premises, since the landlord seeks to remove the tenant) become

---

**10.** Super.Ct. L & T R. 5(a) provides:

> *In general.* In this Branch it shall not be necessary for the defendant to file any answer, plea, affidavit, or other defense in writing except as provided in Landlord and Tenant Rules 6 [jury demand] and 13(b) [summary judgment].

We see no reason why the tenant's argument should preclude a timely written answer asserting a *Javins* defense in the separate, protective order proceeding, since the landlord's claim for disbursement is essentially a claim against a fund representing withheld rent. Presumably, the tenant stresses that an oral answer will do because she did not file a written answer for this separate proceeding.

involved." *McNeal*, 346 A.2d at 514. Accordingly, while code violations "were irrelevant to the 30–day notice to quit, they may well have significance as to the post-return date payment for the tenant's continued use and occupancy of the premises pending the conclusion of the proceeding." *Id.* Thus, a post-trial, evidentiary hearing on disbursement of funds in the registry under the protective order is required as a matter of due process. *Id.*

*McNeal* was a case in which the tenant mooted the possessory action by vacating the premises shortly before trial. Thus, she had remained for some time as a holdover tenant, and the court had a responsibility to calculate the damages awardable to the landlord for the tenant's continued use and occupancy of the premises. *See id.;* At 13 n. 16. Theoretically, this could be more or less than the rent due under the lease. *McNeal*, 346 A.2d at 514; At 13 n. 16. The issue of code violations, therefore, automatically became relevant to the court's assessment of damages and thus to the parties' respective rights to the funds in the registry.[11]

In the present case, however, the tenant prevailed—the lease remained in effect—and thus the payments into the registry, as it turned out, theoretically retained their status as "rent" rather than becoming merely a fund subject to a claim for unliquidated damages. *See* at 13 n. 16. The trial court, therefore, absent an extension of *McNeal*, would not necessarily have had to consider alleged code violations, since rent was a contracted amount, unlike the damages attributable to a holdover tenant.[12] This formalistic difference, however, between the court's award of unliquidated

"damages" or contractual "rent," depending on the outcome of the landlord's action, should not determine whether a tenant has a right to assert code violations at a *McNeal* hearing in a notice case; there is no principled basis for granting the tenant a lesser right in a case where she prevails than in one where she loses.

■ One other aspect of the *McNeal* analysis requires comment. Both *McNeal* and a later notice case which applied its teaching, *Goodwin v. Barnes*, 456 A.2d 1246, 1247–48 (D.C.1983), placed significance on the tenant's assertion of code violations in the answer to the possessory action. Because that assertion was irrelevant to the notice case itself, however—and indeed that portion of the answer would have been vulnerable to a motion to strike—it is clear that a tenant need not assert code violations in the answer to the possessory action to preserve the right to that defense at a *McNeal* hearing. We understand *McNeal* and *Goodwin* to mean merely that the tenant has to raise code violations in a way that timely notifies the landlord and the court that a *Javins* defense will be asserted at the post-trial evidentiary hearing on disbursement of registry funds. Since Super.Ct. L & T R. 5(a), *supra* note 10, does not require a written answer, we deem it sufficient for a tenant orally to notify the landlord and the court about code violations early enough, with sufficient specificity, to afford the landlord a reasonable time within which to prepare for the *McNeal* hearing. A better practice, of course, would be the timely filing of a written pleading directed at the protective order; we see no violation of Super.Ct. L &

---

11. "Also relevant would be any representations to the effect that the tenant has frustrated the landlord's good faith efforts to correct housing code violations," as well as "the length of the period during which the tenant's continued occupancy precluded any other productive use of the premises by the landlord." *McNeal*, 346 A.2d at 514.

12. The monthly payments into the registry were equal to the rental payments under the lease;

indeed, the issue of code violations had not been raised at the time the protective order was entered. In a case where code violations serve as the basis for ordering payments into the registry in an amount less than the monthly rent, *see Bell*, 139 U.S.App.D.C. at 111, 430 F.2d at 484, that issue is necessarily in the case at the time of the disbursement proceeding, just as it is when the court confronts a holdover tenant.

T R. 5(b) if that is done, since the pleading would not be part of the notice case. *See supra* note 10. (Moreover, written pleadings will be necessary if the *McNeal* hearing is to be certified to the Civil Assignment Office for a jury trial. *Infra* Part IV.D. (2)).

In many cases the tenant will give a *Javins* notice at the initial hearing on the landlord's request for a protective order, since tenants commonly seek at that time to pay less than the monthly rent into the registry because of an alleged history of code violations continuing to the time of the complaint and summons. *See supra* note 12. In other cases, however, the tenant may fail to challenge the level of the protective order on that ground, perhaps because at the time the tenant is proceeding *pro se* or (in a rare case) because code violations are not discovered until later. Accordingly, in the event that this issue is not raised at the time a protective order is entered, we leave it to the sound discretion of the trial court to determine whether a tenant has given timely, specific notice of an intended *Javins* defense at the *McNeal* hearing.

In sum, we conclude that the tenant, upon timely written or oral notice of alleged code violations during the litigation period of a notice case, is entitled to a post-trial, evidentiary *McNeal* hearing on whether code violations during that period, but not before,[13] justify an abatement under *Javins* of the rent (or portion thereof) paid into the court registry pending resolution of the landlord's possessory action.[14]

**IV.**

We turn now to the tenant's assertion of the right to a jury trial at a *McNeal* hearing. She argues that, when a landlord asserts the right to receive the funds paid into the court registry in lieu of rent, this assertion, in effect, is a claim for a money judgment—an action at law—wholly separate in nature and time from the possessory action. Accordingly, she says, the tenant has a right to a jury.

The tenant further argues, however, that the Landlord and Tenant Branch has limited jurisdiction; most notably, it has no authority to conduct jury trials. Moreover, she says, because the proceeding for a protective order, culminating in a *McNeal* hearing, is typically based on an oral motion and response—there usually are no written pleadings, let alone service of process—the Landlord and Tenant Branch has no practical way, when it grants summary judgment, to certify the matter to the Civil Assignment Office for a jury trial. Accordingly, argues the tenant, the trial court's only proper course, consistent with its limited jurisdiction and the tenant's right to a jury, is to release the funds to the prevailing tenant without a *McNeal*

13. Any *Javins* claim for the period before the litigation commenced would have to be filed separately in the Small Claims Branch or in the Civil Division, since Super.Ct. L & T R. 5(b) precludes its assertion in a notice case. *See McNeal,* 346 A.2d at 514.

14. In Part IV of our original opinion, we relied on *Temple v. Thomas D. Walsh, Inc.,* 485 A.2d 192 (1984), which had rejected the argument that, when a tenant prevails in a notice case, the trial court is foreclosed from awarding to the landlord any of the funds the tenant had deposited in the registry under a protective order. In *Temple,* the trial court had held a *McNeal* hearing but ordered release of all the deposited funds to the landlord because the tenant had received the benefit of housing but offered no "evidence which would warrant a reduction in the amount due under her lease." *Id.* at 194.

We affirmed this exercise of discretion. In our original opinion in the present case, we implicitly extended *Temple* in two respects. We held that in a notice case, where *Javins* defenses are withdrawn or irrelevant, a tenant is not entitled to a *McNeal* hearing since "she had asserted no claim tending to show that the landlord is entitled to less than the amount paid into the registry." At 13 (footnote omitted). We also held that, "absent an issue of abatement," the court did not have discretion to order the money in the registry returned to the tenant. *Id.* at 14.

As elaborated in the text above, however, we were wrong in ruling that a tenant in a notice case is not entitled to a *McNeal* hearing at which evidence of code violations during the litigation period may be proffered. We conclude, on rehearing, that the tenant is so entitled if the tenant's proffer is timely.

hearing and thus to leave it to the landlord to file a separate claim for unpaid rent in the Small Claims Branch or in the Civil Division if the tenant does not promptly tender the rent due for the litigation period.[15]

A tenant is constitutionally entitled to a jury trial in defending a landlord's action for possession. *Pernell v. Southall Realty*, 416 U.S. 363, 370, 383, 94 S.Ct. 1723, 1727, 1733, 40 L.Ed.2d 198 (1974). Thus, a tenant served with a complaint and summons in a summary proceeding for possession, whether based on a notice to quit or on nonpayment of rent, may file a jury demand, pay a fee (unless excused), and submit a verified answer setting forth her defenses. Super.Ct. L & T R. 6. The Landlord and Tenant Branch will certify the case to the Civil Assignment Office, which will then schedule it for a jury trial on an expedited basis. *Id.* Until the case is called for trial, however, the Landlord and Tenant Branch retains jurisdiction over all motions, *see* Super.Ct. L & T R. 1, such as those concerning the protective order or requesting summary judgment. *Cf.* Super.Ct. L & T R. 5(c) (plea of title; certified to Civil Division not Civil Assignment Office; thus, jurisdiction transferred).

Although a case certified to the Civil Assignment Office shall be "scheduled for trial on an expedited basis," Super.Ct. L & T R. 1, 6, the courts of this jurisdiction have recognized that the inevitable delay between the return date and trial, leaving the tenant in possession, justified creation of an "equitable remedy"—the protective order—to avoid putting the landlord "at a severe disadvantage during the period of litigation." *Bell v. Tsintolas Realty Co.*, 139 U.S.App.D.C. 101, 109, 430 F.2d 474, 482 (1970) (footnote omitted); *accord Smith*, 462 A.2d at 1134; *Davis v. Rental Associates, Inc.*, 456 A.2d 820, 823 (D.C.

1983) (en banc) (plurality opinion). As we noted in our original opinion, moreover, this device also protects tenants, at least in nonpayment cases, from falling further in arrears and risking forfeiture of the lease. At 12. Such protective orders, of course, are now also commonly entered to cover the period between the summons and a bench trial when the tenant elects to keep a possessory action in the Landlord and Tenant Branch. *E.g., Temple*, 485 A.2d at 192; *Goodwin*, 456 A.2d at 1246.

It is helpful to note at this juncture how the trial courts have handled *McNeal* hearings when a jury has decided the possessory action. When the tenant elects a jury trial in a nonpayment case, and the appropriate branch or division of the court does not grant summary judgment or a directed verdict, we understand that some judges permit the jury not only to decide the merits of the landlord's complaint, including the tenant's *Javins* defenses, but also to decide, under *McNeal*, how the money escrowed under the protective order during the litigation period should be apportioned in view of the evidence, if any, of continuing code violations. *Cf. District of Columbia v. Daniel*, 111 Daily Wash.L.Rptr. 621, 625 (D.C.Super.Ct. Feb. 18, 1983) (constitutional right to jury trial on counterclaim for rent abatement from three years before suit through period of protective order to time of trial) (Salzman, J.); *see also Bell*, 139 U.S.App.D.C. at 112, 430 F.2d at 485; *Javins*, 138 U.S.App.D.C. at 381 n. 67, 428 F.2d at 1083 n. 67. (Conceptually, this approach also could be deemed tantamount to a tenant's amendment of the pleadings to assert a *Javins* counterclaim for the entire period of the landlord's complaint through the litigation period, theoretically eclipsing the need for a separate *McNeal* hearing.)

---

15. To be consistent, the tenant would have to make the same argument if the landlord had prevailed. Properly interpreted, therefore, the tenant is arguing that, when summary judgment is granted in a notice case, a tenant who has made a timely jury demand for the *McNeal* hearing always must get back the funds she deposited into the registry, however the possessory action turns out. This argument suggests that a protective order would be useless to the landlord, if not altogether inappropriate, in a notice case.

Other judges, however, heeding this court's characterization of a protective order as an equitable remedy, apparently have resolved the *McNeal* issue themselves, even in a nonpayment case, once the jury has returned a verdict in the possessory action.[16]

A bench trial of the possessory action presents a different problem. Judge Schwelb, confronted by a demand for a jury at a *McNeal* hearing after a bench trial of a nonpayment case in the Landlord and Tenant Branch, ruled that the Seventh Amendment did not entitle the tenant to a jury. *Management Partnership, Inc. v. Garris*, 109 Daily Wash.L.Rptr. 789, 793–94 (D.C.Super.Ct. Mar. 17, 1981). He reasoned that the *McNeal* hearing, as an interim equitable proceeding, was not an adjudication of the rent due for the litigation period, especially because the payments under the protective order in that case were less than the monthly rent. *Id.* at 794. Indeed, Judge Schwelb concluded that "a *McNeal* hearing does not bring about an adjudication" at all, since "[n]o judgment is sought or entered upon the records of the Superior Court reflecting its outcome." *Id.* The *McNeal* hearing, therefore, is an "interim disposition," he wrote, and thus the parties are free to bring separate actions to resolve the back rent issue *de novo*. *Id.* Implicit in that ruling, of course, was an assumption that a *McNeal* hearing has no legally preclusive effect.

We therefore note several unresolved questions that may have to be addressed to assure jurisprudentially consistent results in notice and nonpayment cases:

1. Does the Seventh Amendment guarantee the right to a jury trial at a *McNeal* hearing on a protective order?

2. If so, is there a relationship between a jury demand in the possessory action and a jury demand for the *McNeal* hearing?

Does the answer differ for notice and nonpayment cases?

3. How would the right to a jury at a *McNeal* hearing be implemented if the possessory action itself remains in the Landlord and Tenant Branch?

4. Is the tenant entitled to a jury trial at the *McNeal* hearing, on remand, in this case?

### B.

In addressing the Seventh Amendment question, we begin with the nature of a protective order and its relation to the underlying possessory action. In *Smith*, we reversed the trial court's judgment awarding damages for rent in arrears because the landlord's complaint had sought only possession. We also reversed because the court had included in the same judgment, as additional damages, the amount the tenant had paid into the registry under a protective order:

> The trial court also erred in awarding to appellee the $552 in the registry of the court, but its error lay only in making that award part of its final judgment. The distribution of the funds in the registry was the concluding stage of a separate and distinct equitable proceeding, not part of the underlying possessory action. That proceeding was begun by the entry of the protective order, an equitable remedy designed "to avoid placing one party at a severe disadvantage during the period of litigation." *Bell v. Tsintolas Realty Co.*, 139 U.S.App.D.C. 101, 109, 430 F.2d 474, 482 (1970); *accord, Davis v. Rental Associates, Inc.*, 456 A.2d 820, 823–824 (D.C.App.1983) (en banc) (plurality opinion). Disbursement of the money deposited pursuant to that protective order, with or without a hearing, merely completed the parallel but

16. We are not aware that any trial judge, except for *Daniel's* disposition of a *Javins* counterclaim at a jury trial in a nonpayment case, has held the tenant is constitutionally entitled to a jury for the *McNeal* disbursement proceeding. That is simply a common practice because the jury

has had to resolve the *Javins* defense and/or counterclaim in the possessory action, the code violations are often continuing, and thus the jury is in a position to evaluate the evidence with respect to both the pre-litigation and litigation periods.

discrete equitable proceeding. *See Management Partnership, Inc. v. Garris,* 109 Daily Wash.L.Rptr. 789 (D.C.Super.Ct. March 17, 1981). The release of those funds should therefore have been effected by a separate order entered in the exercise of the court's equity power, not as part of the judgment in the underlying legal action. Accordingly, we vacate that portion of the trial court's judgment awarding to appellee the $552 in the registry of the court and remand this case for entry of a separate order disposing of that money.

462 A.2d at 1134 (footnote omitted).

We have stated more clearly in *Smith* than in any other case that the landlord's application for a protective order commences a "discrete equitable proceeding" that "parallel[s]" but is "not part of the underlying possessory action." *Id.* This is true whether the landlord seeks possession for nonpayment of rent or for noncompliance with a notice to quit.[17]

In calling this separate proceeding "equitable," we have focused only on the nature of the protective order as a fair, interim device to protect the interests of both landlord and tenant pending the outcome of the possessory action. *See Davis,* 456 A.2d at 823–24; *Bell,* 139 U.S.App.D.C. at 109, 430 F.2d at 482. That characterization does not foreclose a closer look at whether the true nature of a landlord's claim to the escrowed amount—the "concluding stage" of the proceeding, *Smith,* 462 A.2d at 1134 —has become a money claim for damages entitling the tenant to a trial by jury. "The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." *Ross v. Bernhard,* 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970) (footnote and citation omitted). " 'The court is

not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the gist of the action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law.' " *Carithers v. District of Columbia,* 326 A.2d 798, 800 (D.C.1974) (quoting *People v. One 1941 Chevrolet Coupe,* 37 Cal.2d 283, 299, 231 P.2d 832, 843–44 (1951) (per curiam)); *cf. Dameron v. Capitol House Associates Limited Partnership,* 431 A.2d 580, 584 (D.C.1981) (dicta) (tenants not entitled to *McNeal* hearing on imposition of protective order, permitting monthly release of portion of deposited funds to landlord; such evidentiary hearing "[a]t this early stage in the proceedings," effecting permanent disposition of property, "would preempt the controversy and might deny a party's constitutional right to a trial by jury").

The Seventh Amendment declares that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved...." U.S. CONST. amend. VII. Unquestionably, a suit for unpaid rent, or for damages from the use or occupancy of realty by a holdover tenant, is an action at law for which the right to trial by jury must be preserved. *Pernell,* 416 U.S. at 370, 94 S.Ct. at 1727 (" 'where an action is ... for the recovery of a money judgment, the action is one at law' " entitling parties to jury) (quoting *Whitehead v. Shattuck,* 138 U.S. 146, 151, 11 S.Ct. 276, 277, 34 L.Ed. 873 (1891)). The fact that the protective order itself was generated by "a demand for equitable relief in aid of the legal action or during its pendency," *Scott v. Neely,* 140 U.S. 106, 110, 11 S.Ct. 712, 714, 35 L.Ed. 358 (1891), therefore, cannot impair that right if a registry disbursement proceeding is truly

---

17. In a nonpayment case, the landlord may seek possession without claiming arrearages, and, even when arrearages are sought, the money escrowed by the tenant during the litigation period does not, and legally cannot, include sums alleged due in the landlord's complaint. *Bell,* 139 U.S.App.D.C. at 110, 430 F.2d at 483.

Thus, even when nonpayment is alleged as the basis for a possessory action, the *McNeal* hearing addresses only the rent claimed due after the return date, during the litigation period. Similarly, funds deposited under a protective order in a notice case have no legal relationship whatsoever to the possessory action.

best characterized as an action at law for unpaid rent or for damages from a holdover tenant. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

By the time of a post-trial *McNeal* hearing, the court, without doubt, is ruling on a landlord's supplementary, usually oral complaint for the rent due (or damages from a holdover tenant) during the litigation period, secured by the amount in the registry; and the tenant is defending, typically, with an oral defense of recoupment based on alleged housing code violations during that same period. Therefore, what began as a parallel, "equitable proceeding" effecting "no permanent disposition of property" pending resolution of the possessory action, *Dameron,* 431 A.2d at 584, has become a money claim—an action at law—for withheld rent (or unliquidated damages), answered by a *Javins* defense seeking an abatement. By this stage of the proceeding, the matter is perceived and treated, in effect, as a final accounting.[18] Each party's jury right, therefore, must be preserved.

The tenant has paid the money into the registry, while retaining a claim to all or part of it based on *Javins.* We find no legitimate basis for saying a judge, after final adjudication of the possessory action, can issue an "interim" order that all or part of this money shall be paid to the landlord, as whole or partial payment of back rent or damages, simply because either party can bring a second, wholly separate jury proceeding to undo this temporary disposition.

*Compare McNeal,* 346 A.2d at 515 n. 15, with *Management Partnership, Inc.,* 109 Daily Wash.L.Rptr. at 794. Indeed, the entry of an "interim" order for the payment of money to a landlord, requiring an altogether separate lawsuit to make it "final," is an anomalous concept in the context of a supposedly final disposition of the escrowed funds. *See Dameron,* 431 A.2d at 584. If such an order were to be justified on the ground it was not an "adjudication," that order might deprive the tenant of due process of law, for despite an evidentiary hearing manifestly intended to resolve the matter finally, *see McNeal,* 346 A.2d at 515 n. 15, the tenant would be forced to yield money to the landlord—regardless or the tenant's own claim to it—without a final court order establishing the parties' respective rights. On the other hand, if the disbursement order were properly characterized as an adjudication, it would have preclusive effect on both parties in a second proceeding, despite the right to a jury, RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment d, unless that later proceeding were a guaranteed appeal *de novo* to a jury on the back rent/damages issue. *Capital Traction Co. v. Hof,* 174 U.S. 1, 45, 19 S.Ct. 580, 597, 43 L.Ed. 873 (1899); *Windholz v. Willis,* 1 Kan.App.2d 683, 685, 573 P.2d 1100, 1102 (1977).

It often will be true, as in *Management Partnership, Inc.,* that the amount of money in the registry is not necessarily the amount to which the landlord is ultimately entitled for rent/damages during the litigation period; the landlord may be entitled to more, or less. But a

---

18. We recognize that the matter is legally complex. The tenant's payments into the registry—as in this case—may conform exactly to the monthly rent payable under the lease. In other instances, however, the payments may be less because the tenant has convinced the court, at the time the protective order was entered or thereafter, that there were code violations justifying smaller payments for the time being. Accordingly, in a case where the fund in the registry does not correspond to the rent due for the litigation period under the terms of the lease, there is a nice question whether a *McNeal* hearing on disbursement of that fund must resolve the ultimate question of the landlord's right to a particular amount of rent for the litigation period (or, in the case of a holdover tenant, of the landlord's right to damages for the tenant's continued use and occupancy of the premises). *See Management Partnership, Inc. v. Garris,* 109 Daily Wash.L. *Rptr.* 789, 793–94 (D.C.Super.Ct. Mar. 17, 1981). The answer, as elaborated below, has to be "yes."

court in most cases cannot rationally make a final disbursement decision at a *McNeal* hearing (unless the parties agree a portion is uncontroverted) without initially determining that underlying issue, for which the right to a jury trial must be preserved. A disbursement order after the conclusion of a possessory action is not like a summary possession order, based on "some rent" in an unadjudicated amount being due. *See Tutt v. Doby,* 148 U.S.App.D.C. 171, 459 F.2d 1195 (1972). While the right to possession does not depend on an adjudication of exactly how much rent is overdue, the right to money under a final disbursement order presupposes resolution—indeed, an adjudication—of the parties' respective allegations as to the amount of rent/damages, if any, due the landlord for the litigation period.[19]

Implicit in this analysis, therefore, is the obligation of the fact-finder at a *McNeal* hearing to determine the entire amount due, if any, for the litigation period and to enter a judgment accordingly. This is necessary to preserve the landlord's rights in the event the funds in the registry are insufficient to cover the tenant's obligation, as well as to preserve the tenant's rights in the event funds paid to the landlord from the registry pending resolution of the possessory action, *supra* note 19, exceed what the landlord is due. Otherwise, *res judicata* might bar a landlord's or a tenant's later claim for a deficiency.

■ In sum, we conclude that a tenant or a landlord is entitled to a jury trial, upon timely request, to determine the parties' respective rights in the fund deposited by the tenant in the court registry pursuant to a protective order covering the period while a landlord's action for possession is pend-

ing. That, however, does not end the matter.

### C.

Next, we consider two questions: how the right to a jury at a *McNeal* hearing relates to the right to a jury in the possessory action itself, and whether the nature of that action—notice or nonpayment—makes any difference.

In most instances where a tenant will elect to assert a *Javins* defense as to disbursements from the registry, the code violations allegedly will have existed for some time before the landlord filed suit for possession. Rarely will the tenant's concern about code violations be limited to the period after the return date. Accordingly, if this were a nonpayment case, a tenant who desired a jury trial on a *Javins* defense and/or counterclaim presumably would file a jury demand at the time of the answer so that the possessory action itself, not merely the disbursements under a protective order, would be certified to the Civil Assignment Office for trial. Except for the rare case in which code violations occur for the first time during the litigation period, we anticipate few cases in which a tenant in a nonpayment case would want a bench trial for the possessory action but a jury trial for the protective order disbursement proceeding. This is especially so since code violations during the period of alleged nonpayment, *if proved,* typically are reasserted for the litigation period and, purely as a practical matter, are likely to be proved more easily in light of the demonstrated violations earlier.

Obviously, code violations can occur, be corrected, and recur. We do not mean to

---

**19.** This is especially clear from the fact that there may be cases where the court has permitted a partial release of funds from the registry to the landlord during the pendency of the protective order, based on estimates of the landlord's need to meet mortgage and other expenses, *see Bell,* 139 U.S.App.D.C. at 111–12, 430 F.2d at 484–85, weighed against the tenant's need for retention of an amount sufficient to secure her *Javins* defenses. *See Dameron,* 431

A.2d at 582. These payouts "effect [ ] no permanent disposition of property," *id.* at 582, and thus are subject to review at the *McNeal* hearing. There is a special responsibility at a *McNeal* hearing, therefore, to be sure that the final distribution is precisely in accord with the parties' respective rights and obligations for rent/damages over the entire litigation period, including any necessary judgment for a deficiency awardable to either party.

suggest that there is a consistent pattern in how *Javins* defenses fare in the prelitigation and litigation periods, respectively. We are simply suggesting that, in our view, tenants who assert *Javins* defenses and/or counterclaims in nonpayment cases typically will want to assert them before a jury in both the possessory action and in the related protective order disbursement proceeding, which in practice are often consolidated at trial before the jury.

In a notice case, however, code violations are not a defense; they are relevant only to the protective order. On the other hand, a tenant-defendant in a notice case has the right to a jury, *Pernell*, 416 U.S. at 370, 383, 94 S.Ct. at 1727, 1733, and can ask for certification to the Civil Assignment Office. But there is a practical problem here. Because the Landlord and Tenant Branch retains jurisdiction over a notice case until trial—even when a jury is demanded—the tenant-defendant who elects a jury cannot file a *Javins* defense or counterclaim in the pleadings to be certified, as the tenant can in a nonpayment case. Super.Ct.L & T R. 2, 5(b). Thus, under present practice, to achieve a jury trial on alleged code violations during a tenancy for which the landlord has served a notice to quit, the tenant must file a separate claim, with a jury demand, in the Small Claims Branch, Super.Ct.Sm.Cl. R. 6 (jury demand), or in the Civil Division, Super.Ct.Civ.R. 38 (jury demand), in lieu of a counterclaim in the certified notice case. Presumably, how-ever, if the cases went to trial, the tenant could achieve a consolidation, upon motion,[20] so that the two could be tried together before a jury in the Civil Division, as are the claim and counterclaim in a nonpayment case. The jury, then, as in a nonpayment case, could consider not only the tenant's claim for a rent abatement during the period before the possessory action was filed but also her claim for abatement during the *McNeal* phase.

 We surmise that in many if not most cases, a tenant who wants a jury for a *McNeal* hearing in a notice case will want a jury for the possessory action itself. Moreover, as we have noted, such consolidation is feasible. We anticipate the possibility, however, that a tenant may be satisfied with a bench trial for the possessory action based on a notice to quit while electing a jury trial for the *McNeal* phase. Conceivably, though perhaps less likely, a tenant in a nonpayment case may want a jury trial only for the *McNeal* hearing. In either case, we perceive no reason why these alternatives should not be available. Accordingly, although a tenant, in anticipation of a protective order, may file a jury demand for both the possessory action and an anticipated *McNeal* hearing when the tenant files her answer to the complaint for possession, *see* Super.Ct. L & T R. 6, we conclude that the tenant may treat the two proceedings separately and file a jury demand for the *McNeal* hearing alone.[21]

---

20. Superior Court rules do not make clear what judge should rule on the motion to consolidate. Until cases certified to the Civil Assignment Office by the Landlord and Tenant Branch and the Small Claims Branch are actually called for a jury trial, those respective branches of the Civil Division retain jurisdiction. *See* Super.Ct. L & T R. 1; Super.Ct.Sm.Cl.R. 1. Thus, unless the rent abatement claim is filed in the Civil Division, no judge assigned to that division, as such, will yet have a clear responsibility, before trial, to rule on a motion to consolidate. The judges of the two branches, however, are technically sitting in the Civil Division; arguably, therefore, either a small claims judge or a landlord and tenant judge has divisional authority to rule on such a motion. Or, under the circumstances, perhaps the civil motions/calendar control judge is a logical choice. In any event, we are satisfied that the question of selecting the proper judge within the Civil Division to rule on a motion to consolidate under these circumstances can easily be resolved administratively and, eventually, be announced by court rule.

21. If a landlord in a notice case wants to prevent a jury trial for the *McNeal* phase, the landlord can forego a protective order. If we focus on strictly notice cases, it is difficult to understand why there would be a need for a protective order in any event, since presumably nonpayment of rent is not an issue. Moreover, as we pointed out in Part II of our original opinion, a landlord who sends a notice to quit may reserve the right to continue to receive rent

The Superior Court presumably will want to adopt rules governing the preparation and timing of pleadings, including the jury demand, when a tenant who accepts a bench trial for the possessory action elects a jury for the *McNeal* hearing. Such rules will also have to cover the situation when the Landlord and Tenant Branch grants either party's motion to dismiss or for summary judgment, as well as a landlord's motion to strike the tenant's pleadings for failure to comply with the protective order. For the time being, however, we must outline the procedures to be followed.

### D.

Before addressing the procedures to elect a jury for a *McNeal* hearing, we should resolve a threshold question that could affect the volume of jury proceedings.

### (1)

 We have rejected the analysis in our original opinion that required the trial court as a matter of law, given the pleadings in this case, to disburse the registry funds to the landlord. We should reconsider, however, whether *Temple*—which precludes automatic release of those funds to a prevailing tenant—nonetheless permits discretionary release to such a tenant without a *McNeal* hearing, thereby obviating the need for a jury trial in some cases.

The answer has to be no, for three reasons. First, on the assumption that a protective order in a notice case was appropriately entered, there is no basis for assuming that a tenant who has asserted code violations during the litigation period would tender, upon release, the full sum to the landlord; a controversy would immediately ensue. *McNeal* itself rejected the suggestion in *Bell*, 139 U.S.App.D.C. at 112, 430 F.2d at 485, that, when a notice case is mooted by the tenant's vacation of the premises, the money in the registry should be returned to the tenant "unless the landlord promptly goes to court to seek a money judgment for rent actually due" during the litigation period (and the protective order is accordingly extended). *McNeal* reasoned that, because "[t]he parties and the money are before the court[,] it would be pointless to call for instituting a new proceeding as a means of concluding the existing one." 346 A.2d at 515 n. 15. Although the equities in *McNeal*, where the tenant mooted the case, more clearly favored the landlord than the equities do here, where the landlord lost his claim for possession, the fact remains that the tenant in this case has announced a code violation defense for the litigation period. This makes it imperative, as in *McNeal*, that a known controversy over which the court already has jurisdiction should not be ignored by an act of disbursement which itself is likely to generate another law suit.[22] It would no more be fair to permit release of the funds to the tenant than to the landlord without a final adjudication.

Second, the only other basis for disbursing the registry funds to the tenant, without a *McNeal* hearing, would be her assertion that the Landlord and Tenant Branch

---

without waiving the notice. At 7. In that way, the landlord would be better off financially than he or she would be if the money were paid into court.

While this reasoning may be theoretically correct, the landlord may have a different approach. A landlord with a notice claim may wish to obtain a protective order, instead of continuing to receive rent directly, in anticipation that the tenant may default on the payments into the registry. If that were to happen, the landlord could move to strike the tenant's pleadings in the notice case with the hope of prevailing without trial of the notice issue. *See Davis v. Rental Associates, Inc.*, 456 A.2d 820 (D.C.1983) (en banc) (plurality opinion). The landlord's motion to strike could not be granted summarily, however; the trial court must carefully scrutinize the reasons for the tenant's default and may under the circumstances, deny the motion. *See Battle v. Nash*, 470 A.2d 1252 (D.C.1983); *Davis*, 456 A.2d at 831, 832–34 (Ferren, J., concurring in result).

22. If a tenant who prevails in a notice case has not timely asserted code violations with respect to the litigation period, we believe—as we said in our original opinion—that *Temple* mandates disbursement of the funds in the registry to the landlord.

is not equipped to certify an informally pleaded protective order to the Civil Assignment Office for a jury trial. We have outlined above, however, that this can be done. Accordingly, there is no practical impediment that would force a release of funds to the tenant without an evidentiary hearing.

Finally, on the premise, *see Temple,* that rights to the accumulated funds should depend on the merits of the landlord's claim for rent/damages during the litigation period, not on who prevailed in the possessory action, *McNeal* makes clear that due process requires an evidentiary hearing. Moreover, we have now held that the *McNeal* hearing must finally adjudicate the rent/damages issue as the predicate for disbursement. Accordingly, there is no principled basis for a discretionary award of the funds to either party until such a hearing and adjudication takes place.

While the foregoing analysis is applicable to most cases, it is not intended to foreclose the partial distribution of funds in the registry to either party in the event a portion is uncontested. Furthermore, there will be cases in which the protective order itself authorizes a partial disbursement of the funds to the landlord each month pending resolution of the possessory action. *See supra* note 19. During the period between conclusion of the possessory action and the decision at a *McNeal* hearing, the protective order will remain in effect. Thus, the tenant will continue to make payments and, if the order so provides, the landlord will continue to receive partial payouts—subject to the trial court's sound discretion.

(2)

▮▮ Given that the Landlord and Tenant Branch cannot order final disbursement of funds from the court registry without an evidentiary hearing when the tenant timely has asserted a *Javins* defense, and further given the right to a jury at that *McNeal* hearing, we face an inescapable conclusion. We hold that, if the tenant or the landlord makes a timely jury demand, the Constitution requires that the disbursement pro-ceeding must either (1) be certified to the Civil Assignment Office for an expedited jury trial, *see* Super.Ct. L & T R. 1, 6, or (2) be tried initially in the Landlord and Tenant Branch, while preserving the tenant's or landlord's right to appeal the court's ruling to the Civil Division for a jury trial *de novo, Capital Traction,* 174 U.S. at 45, 19 S.Ct. at 597, with the protective order still in effect pending Civil Division resolution. We leave it to the Superior Court to decide which alternative is preferable.

▮▮ Until Superior Court rules provide otherwise, we conclude that when a *McNeal* hearing alone is to be certified to the Civil Assignment Office, a jury demand must be filed no later than the day of trial of the possessory action in the Landlord and Tenant Branch or, if there is a motion to dismiss or for summary judgment—or a motion to strike the pleadings for failure to comply with the protective order, *see Davis,* 456 A.2d at 827–29—no later than the date the party demanding a jury files the motion or opposition, as the case may be. The trial court may extend the time for filing for good cause shown. In all other respects the requirements of Super.Ct. L & T R. 6 shall be satisfied, including certification for trial on an expedited basis.

▮▮ In addition, the parties must expeditiously prepare pleadings for the trial court to review and certify. Because the court already has jurisdiction of the parties, they may serve these pleadings on one another as if the action already has been commenced; the formality of a separate service of process to institute the proceeding will not be necessary. As a practical matter in a nonpayment case, the existing pleadings presumably can be amended with dispatch to cover the litigation period, since the landlord will have pleaded the rental agreement and in virtually all instances the tenant will have recited the alleged code violations in the answer. In a notice case, however, the pleadings will not contain allegations germane to the *McNeal* hearing (unless, as in this case, code violations were

originally alleged in response to a nonpayment count). In either case, however, as a way of minimizing delay, the party demanding a jury shall file an amended or supplemental pleading with the jury demand, and a written response shall be due within five days (calculated pursuant to Superior Court rules). In this way, an appropriate package of pleadings will be ready for certification at the time of summary disposition or within a few days after trial.

### E.

■ We turn, finally, to the question whether the tenant in this case has preserved her right to a jury at the *McNeal* hearing on remand.

After summary judgment in her favor, the tenant did not ask the trial court for a jury at a *McNeal* hearing. Instead, although she had filed a jury demand in the possessory action, she understandably relied on pre-*Temple* precedent in the trial court supporting her argument that, as the prevailing party, she was entitled automatically to the funds she had deposited into the court registry. *Board of Trustees, Northminster Presbyterian Church v. Roy,* 109 Daily Wash.L.Rptr. 2509 (D.C.Super.Ct. Nov. 16, 1981) (Salzman, J.). Consistent with that approach, she has argued on appeal *not* that she wants a *McNeal* hearing with a jury if the case is remanded, but that the trial court properly released the registry funds to her, the prevailing party, as the only way to avoid an assertedly impractical certification of a *McNeal* hearing to the Civil Assignment Office for a jury trial.

We have concluded, of course, that such certification is both required and feasible. Moreover, the tenant's argument on appeal implicitly contains, as a fallback position, the claim of right to a jury at a *McNeal* hearing on remand; she has presented a complete Seventh Amendment analysis in her briefs. Finally, the tenant cannot be faulted for failing to ask the trial court for a *McNeal* hearing with a jury. Given the

Superior Court precedent on which she relied, in contrast with our decision in *Temple,* which was issued after she had prevailed, there was no reason to proffer the Seventh Amendment argument until she had to contend with *Temple* on appeal in a supplemental brief, following submission of her original brief.

We conclude, accordingly, that given the tenant's timely jury demand, as well as our *Temple* decision after the trial court proceedings had concluded, she has done all that could be expected to preserve her right to a jury on remand for a *McNeal* hearing.

Accordingly, after rehearing Part IV of our original opinion, we reverse and remand for a *McNeal* hearing. The tenant shall have the right to a jury, in accordance with the procedures authorized by this opinion, on the rent due the landlord for the litigation period—and thus on the landlord's and tenant's respective claims to funds originally deposited by the tenant into the court's registry.

*So ordered.*