**DOUBLE H HOUSING
CORPORATION,**
Appellant,

v.

**Brian DAVID, Appellee.**

No. 05–CV–1268.

District of Columbia Court of Appeals.

Submitted Jan. 7, 2008.
Decided March 13, 2008.

Timothy Cole was on the brief for appellant.

Bernard A. Gray, Sr., Washington, DC, was on the brief for appellee.

Before FARRELL, FISHER and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Double H Housing Corporation ("Double H") filed a Complaint for Possession in the Superior Court Landlord Tenant Branch, charging that its tenant, Brian David, had failed to pay rents due for October through December 2004. Double H now appeals the court's judgment in favor of David. We reverse in part, affirm in part, and remand.

### Factual Background and Procedural History

In 1995, David entered into a lease agreement with Double H for an apartment located at 4601 Connecticut Avenue, N.W., for a lease term commencing July 29, 1995, and ending July 31, 1996.[1] After the lease expired, David continued to occu-

---

1. Double H's brief advises the court that the property is exempt from rent control.

py the apartment as a month-to-month tenant.[2] By letter dated May 27, 2003, Double H notified David that his rent, which was then $1,473 per month, would increase effective August 1, 2003. The letter stated that the increased rate would be $1,488 per month if David signed a new lease. Otherwise, the new rent for continuation of David's month-to-month tenancy would be $1,561 per month.

David commenced paying $1,488 per month as of August, 2003, but never signed a new lease. During a bench trial before the Honorable Mary Gooden Terrell, David testified that he had negotiated with Double H rental manager Tony Towler to pay that amount instead of the $1,561 quoted in the May 27, 2003 notice.[3] The court admitted into evidence a past-due-rent notice that Double H sent to David on August 14, 2003 for failing to pay the $1,561, and Double H property manager Maria Wilsey testified that Double H had sent David other past-due notices as well. But no other past-due notices were introduced into evidence,[4] and David testified that Double H sent him no "other notices that my rent was deficient or not paid

correctly." It was undisputed that Double H continued to negotiate David's payments of $1,488 per month for each month up to and including October 2004.[5]

This was notwithstanding the fact that on May 24, 2004, Double H sent David a letter notifying him that his rent would increase again effective July 1, 2004. In pertinent part, the May 24, 2004 letter advised David that he could "renew [his] current lease for another 12–month term starting July 1, 2004, at the same Lease rate of $1,561.... Should you decide not to sign for another one-year lease, your rental rate will be $1,611 per month." David wrote a response letter to Double H explaining that his current rent was $1,488, not $1,561; asserting that the "12–month cycle for adjustments to the rent terms for my apartment commences August 1, not July 1"; and stating that he was agreeable to maintaining the rent at $1,488, but that a new lease "should not be necessary." In a follow-up letter to David dated July 8, 2004, Wilsey stated that because David was on a month-to-month tenancy, "your rent may be increased at any time, given a 30–day notice," that David

---

**2.** *See* D.C.Code § 42–3505.01(a) (2001) (stating in pertinent part that "no tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit."). This provision of section 42–3501.01(a) applies broadly, even to rental units that are not subject to rent control. *See Administrator of Veterans Affairs v. Valentine*, 490 A.2d 1165, 1170 (D.C.1985) (observing that a nearly identical predecessor provision, D.C.Code § 45–1561 (1973), "evinces an intent to protect from evictions persons who *have been renting* apartments and who continue to pay the rent") (italics in the original), and noting that the Rental Housing Act defines "tenant" to include "a tenant, ... or other person entitled to the possession, occupancy, or the benefits thereof of *any* rental unit owned by another person."

*See* D.C.Code § 42–3501.03(36) (2001) (italics added).

**3.** David testified that he explained to Towler that he had lived in the apartment for eight years and had always timely paid his rent, and that there were "no complaints against [him]" and thus a year-long commitment was not necessary.

**4.** Wilsey testified that she would "have to go back through two years' worth of history" to say how often Double H had sent David past-due notices.

**5.** David's checks were actually for the amount of $1,653; he wrote in the memorandum line on his checks that this amount included $1,488 for apartment rent and $165 for parking. It appears that at least some of David's payments were via automatic debit through his bank account.

had the option to "renew for another 12–month term for a monthly rate of $1,561, or to continue on a month to month term at a rate of $1,611 per month," and that "[t]here is no offer to renew for a rate of $1,488 per month."

David continued to pay $1,488 per month and Double H cashed his checks for July, August, September and October, 2004. In November 2004, however, Double H began returning David's checks. Double H returned his checks for November and December 2004, and then, on December 20, 2004, filed its complaint for possession for non-payment of rent, which the complaint stated was $1,611 per month.[6] The Superior Court docket sheet indicates that service of the complaint on David was accomplished by posting on January 14, 2005.

One of Double H's trial exhibits indicates that Double H returned David's January 2005 check for $1,488, but cashed his February 2005 check for $1,488. The Superior Court docket sheet shows that beginning in March 2005, David made rent payments of $1,561 into the court registry, pursuant to what the docket sheet states was a "protective order by consent."

At the close of the bench trial held on October 5, 2005, the trial judge ruled that Double H was not entitled to the arrearages that it sought. The court reasoned that Double H was "entitled to rent increases, but it should not be conditioned upon whether someone negotiates a new lease," because that approach "puts the tenant at a tremendous disadvantage." The court ruled that the rental rate would be considered $1,488, the amount "that had been accepted for a whole year." The court also held that the offer of a lower monthly rent in exchange for signing a new lease was "void." The trial judge stated that "if the landlord wants to increase the rent, then they need to ... do a rental increase, and not condition it upon any leases being signed...."

This appeal followed.

## Analysis

### I.

■ Double H's brief focuses on the following issue: whether a landlord, entitled to increase the rent charged to its month-to-month tenant, may require the tenant to execute a new lease agreement as a condition of receiving a discount from the otherwise applicable rent increase. We agree with Double H that a landlord may do so, absent circumstances that would support a finding that the tenant was effectively coerced into abandoning the month-to-month tenancy that he was entitled to maintain under District of Columbia law (specifically, D.C.Code § 42–3505.01).

By providing that "no tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit," section 42–3505.01 guarantees a holdover tenant the *opportunity* to continue his tenancy on a month-to-month basis as long as he pays the rent. It does not, however, mandate that any continued tenancy must

---

6. As amended in February 2005, the complaint sought arrearages and late fees for the period October 1, 2004 to December 31, 2004. During the trial, however, Wilsey testified that the arrearage amount was $9,773, an amount that reflected alleged underpayments since August 2003, the effective date of the first increase in issue, and that gave David credit for amounts paid into the court registry. As discussed *infra,* the trial court ruled on the issue of whether David owed additional rent for the period commencing August 1, 2003.

be month-to-month or preclude the landlord and tenant from agreeing to a new or renewed lease. We can imagine a disparity between (i) the monthly rent charged to a tenant who continues residence as a month-to-month tenant and (ii) the monthly rent charged upon execution of a new lease, that is so large that the tenant is effectively forced to sign a new lease. In such a case, we might well hold that the "choice" presented by the landlord conflicts with section 42–3505.01, because it denies the tenant a meaningful opportunity to remain as a month-to-month tenant.[7] But the trial court did not find (and the record provides no basis for a finding) that there was such a huge disparity here or that David was denied a meaningful choice.[8] We therefore cannot agree that Double H was precluded from offering to charge David a discounted rent amount if he signed a new lease but charging him a higher monthly rent if he continued his month-to-month tenancy.[9] To hold otherwise would, we think, encroach on the landlord's—and tenant's—" 'basic freedom to contract as he will,' " which we have said remains one of the "rather basic rights incident to the ownership of property [that] ought not to be summarily dismissed as obsolete" even under our modern statutory rental housing law. *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1297 (D.C.1990) (quoting

*White v. Allan,* 70 A.2d 252, 255 (D.C. 1949)).

■ Because we conclude that the trial court's judgment was not required in order to give effect to section 42–3505.01, we cannot uphold the judgment for the reasons that the trial court stated. However, our holding that Double H could condition a rent discount on David's signing a new lease does not lead us to declare that Double H is entitled to recover the rent it demanded for the period in issue. Rather, for reasons that we explain *infra,* for the months through October 2004, we affirm the court's judgment that David did not owe the rent that Double H demanded.[10] For the period from November 2004 through February 2005, we remand the case to the trial court to determine the monthly payment amounts for which David was liable.

## II.

■ Paragraph 32 of the 1995 lease agreement between Double H and David states as follows:

> HOLDING OVER: Should Tenant continue in possession after the end if the term, herein created with permission of the Landlord, it is agreed that the tenancy thus created can be terminated by either party giving to the other party no

7. *Cf. Auger v. Tasea Inv. Co.,* 676 A.2d 18, 22 (D.C.1996) (Ferren, J., dissenting) ("If a landlord serves on the tenant a valid notice to quit and says, at the same time, that as of the termination date the rent will increase 100–fold if the tenant holds over, the trier of fact will confront the question whether, under all the circumstances, the tenant can be held to have agreed to a new, higher-rent tenancy if the tenant stays on the property or will be held responsible, instead, for damages based on fair use and occupancy value").

8. Judge Terrell did observe generally that conditioning a rent discount on whether a tenant signs a new lease "puts the tenant at a

tremendous disadvantage," but she did not make a specific finding that David was disadvantaged or deprived of a meaningful choice.

9. Such a bargain might benefit both parties: the tenant would pay a lower rent, and the landlord would have the predictability of a lease for a fixed term.

10. We "may affirm a decision for reasons other than those given by the trial court." *Kingman Park Civic Ass'n v. Williams,* 924 A.2d 979, 987 n. 10 (D.C.2007) (citation omitted).

less than thirty (30) days' written notice from the first day of the month, to expire on the last day of the month. In so continuing the Landlord reserves the right to renegotiate new terms and conditions pertaining to the rent at that time, and the Tenant covenants and agrees to keep and fulfill all other conditions and agreements herein and in case of default in payment of rent, hereby waives the right of any notice to quit. Thus, the parties' agreement called for "renegotiat[ing] new terms and conditions pertaining to the rent" should David holdover after his lease expired.

■ When Double H informed David unilaterally in May 2003 and May 2004 that the rent for continuing his month-to-month tenancy would increase to $1,561 as of August 1, 2003, and then to $1,611 as of July 1, 2004, David remained in his apartment and continued to pay only $1,488. The record makes clear that David did not simply agree to pay the higher rent that Double H demanded.[11] He sought to negotiate a lower month-to-month rent, and in the meantime, simply held out, resisting Double H's demands and (it appears) hoping that Double H would relent and accept the lower amount ($1,488) that he tendered each month.

The trial court found that Double H had accepted David's payments of $1,488 "for a whole year" after Double H announced the rent increase that would take effect on August 1, 2003. In fact, the evidence is that Double H accepted David's payments for fifteen months, *i.e.* through October 2004, notwithstanding a few protests along the way. The trial judge did not use the term "accord and satisfaction," but her conclusion that she would consider the rent to be $1,488 appears to rest on that

doctrine. And although the facts might support a different conclusion, we cannot say that the trial court clearly erred or abused her discretion in finding (implicitly) that there was an accord and satisfaction establishing the rent at $1,488 for those months when Double H cashed David's checks for that amount.

■ "Accord and satisfaction is a method of discharging and terminating an existing right and constitutes a perfect defense in an action for enforcement of the previous claim." *Pierola v. Moschonas,* 687 A.2d 942, 947 (D.C.1997). We explained in *Saul Subsidiary II Ltd. P'ship v. Venator Group Specialty, Inc.,* 830 A.2d 854, 864–65 (D.C.2003), that:

> Often, accord and satisfaction arises as a defense when one party tenders a check to the other that contains the phrase "payment in full" or other words to that effect.... Where the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, clearly expressing his intention that it is sent as a settlement in full, and not on account or in part payment, the retention and use of the money or cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction.

830 A.2d at 864–65 (quoting *Pierola v. Moschonas,* 687 A.2d at 947). For there to be an accord and satisfaction, there must be "(1) a legitimately disputed or unliquidated claim, (2) a mutual agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim, and (3) the actual giving and taking of the agreed upon substitution." *Pierola,* 687 A.2d at 947 (citing *Stinson v.*

---

11. And, as one court put it, "[a] unilateral statement of rent does not per se create a contract." *Barrett v. Ray L. Stoddard Co.,* 1985 Conn.Super. LEXIS 158, *6 (Conn.Super.Ct.1985).

*Mueller*, 449 A.2d 329, 331–32 (D.C.1982)). There can be a legitimate dispute about an amount owing "even if a party's assertion is incorrect provided that the assertion is made in good faith." *Pierola*, 687 A.2d at 948. As to the agreement, not only need it not be explicit, but "even if the creditor affirmatively rejects the debtor's offer of accord and satisfaction, the accord and satisfaction will still be effective if the creditor proceeds to cash the check." *Pierola*, 687 A.2d at 947 (noting also that no "meeting of the minds" is required).

 As the quotation from *Pierola* indicates, in many cases in which courts have applied the doctrine of accord and satisfaction, the debtor's intention to pay in full through tender of a check for less than the creditor demands was indicated by a "payment in full" or similar notation on the check itself. However, other manners of conveying the debtor's intent in tendering the check may be a sufficient basis for application of the doctrine. *See, e.g., H.H. Butler Stores, Inc. v. Barron*, 95 A.2d 330, 331 (D.C.1953) (considering whether the creditor "from all the facts [should] have understood that [the] check was offered as accord and satisfaction," and declining to apply the doctrine because neither the face of the check nor the letter transmitting the check indicated that the check was intended as full payment); *Conover v. Halley*, 32 A.2d 110 (D.C.1943) (same). The fundamental requirement is that the debtor "must intend the amount paid as a liquidation of [the creditor's] claim, and the [creditor] in accepting it must understand that it is so intended." *Curtis Builders v. General Floor Service, Inc.*, 107 A.2d 705, 706 (D.C.1954) (citing *Andrews v. Haller*, 32 App. D.C. 392

(C.A.D.C.1909)). If the creditor cashes the check with that understanding, it is of no moment that the creditor withheld assent to treating the payment as payment in full or even "expressed protest before the check was tendered or that the parties came away from their meeting with contrary understandings," because "the creditor's action speaks louder than his words and is operative as an acceptance of the offer as made." *Laganas v. Installation Specialties, Inc.*, 291 A.2d 187, 189 (D.C. 1972) (quoting 6 CORBIN, CONTRACTS § 1279 (1962)); *Rustler's Steak House v. Environmental Assocs.*, 327 A.2d 536, 539 (D.C. 1974) (finding an accord and satisfaction where the creditor "from the facts should have understood" that the check it cashed was intended by the debtor as a liquidation of the creditor's claim, and stating that "[s]ilent acceptance of a check sent in payment of a disputed claim, even in the absence of a finding of mental assent, is now generally held to constitute an accord and satisfaction"). "In short, the creditor cannot have it both ways. If he takes the satisfaction, he is bound by the accord." *Pierola*, 687 A.2d at 947.

Here, the facts made permissible (even though they may not compel) a finding that, each month through October 2004,[12] there was an accord and satisfaction by which Double H relented and "accepted" David's continued payments of $1,488. Double H cashed David's checks for $1,488 for August 2003 and later months even though it had notified him that his rent for continuation of his month-to-month tenancy would be $1,561 commencing August 1, 2003. Further, David testified about an agreement with the Double H rental manager that he could continue to pay the

---

12. *See Keuroglian v. Wilkins*, 88 A.2d 581 (D.C.1952) ("In tenancies from month-to-month each month is regarded as a new 'periodic tenancy,'—a tenancy for a month certain

plus an expectancy or possibility of continuation for one or more similar periods") (internal quotation marks and citations omitted).

lower amount, and his letter transmitting the rent check for November 2003 refers to such an agreement. As already noted, the trial court found that Double H had accepted David's payments of $1,488 "for a whole year" after Double H announced the rent increase that would take effect on August 1, 2003. Thus, it found that Double H "accepted" David's rent payment of $1,488 for July 1, 2004, even though Double H had given David notice in May 2004 that his rent would increase to $1,611 effective July 1, 2004, if he failed to sign a new lease. Double H cashed David's July rent check in the amount of $1,488, but, then, in its July 8, 2004 letter to him, renewed its demand for the higher $1,611 rent. Nevertheless, David continued to tender payments in the amount of $1,488, and Double H continued to cash the checks through October 2004, without proof of protest. Double H introduced into evidence only one past-due-rent notice, dated August 14, 2003, and David testified that Double H sent him no other past-due rent notices.

In addition, David testified that during the summer of 2004,

> I asked [Wilsey] why other tenants were being offered a very special opportunity to renew at the same lease rate, but when I informed them that [$1,561] wasn't my lease rate, that they had the wrong number in there, why were they singling me out and increasing my rent when others were being offered the same rent as before. She did acknowledge that there were tenants that had received a zero dollar increase at that time. And then she alluded to the fact that there were some accounting problems ... under Mr. Tow[l]er when he was the rent manager and that she would get back to me on that.

Wilsey testified that in November 2004, Double H "returned [David's] rent to him ... because he continued to pay the wrong amount. *And we told him that we would return his check if it was not for the correct amount*" (emphasis added). And, Double H's complaint did not seek to recover any additional amounts for the period prior to October 2004.

In sum, there was a genuine dispute about what rent David was obligated to pay, with David demanding that he be permitted to continue at the "same rent" he had been paying, like other tenants.[13] David communicated his position through his correspondence and conversations with Towler and Wilsey, and continued to pay only $1,488 per month. Double H, whose staff described to David the landlord's policy of returning rent checks that were not for the correct amount, continued to cash the checks through October 2004. These facts permitted a finding that Double H cashed David's checks with an understanding that David tendered his payments of $1,488 as payment in full. *Cf. Town Ctr. Mgmt. Corp. v. Chavez*, 373 A.2d 238, 241–43 (D.C.1977) (declining to disturb trial court's finding of an accord and satisfaction, based on tenant's having withheld certain amounts from the check for his August and September rent and having attached a cover letter "invit[ing] discussion concerning the amount of the deductions," and landlord's having retained the check without any protest and demand for further payment); *Barrett*, 1985 Conn.Super. LEXIS 158 at *6 (reasoning that landlord's "long retention without explanation" could "constitute acceptance of an offer of rent," and holding that landlord's receipt of tenant's $600 rent checks without complaint from December 1983 to April 1984 constituted acceptance of that rent

---

13. We emphasize that this is not a case of simple failure to pay, or payment of less than

the agreed-upon rent, neither of which would support a finding of accord and satisfaction.

amount, even though landlord had demanded $1,200 per month). At least arguably, therefore, there was an accord and satisfaction for the months up through October 2004, with the results that David's payments of $1,488 discharged his debt and that Double H was not entitled to recover more from him for those months. For that reason, we will not disturb the trial court's holding that the "rental rate ... will be considered ... $1,488" for the months in issue prior to November 2004.

## III.

Beginning in November 2004, however, a number of things changed that possibly call for a different outcome for those months. Starting with November 2004, Double H began returning David's checks. At the very least, it seems, this signaled to David the negotiating period was at an end and that Double H was insisting on payment of the higher rent it had demanded as a condition of David remaining in his unit.[14] On the other hand-even though David had waived the right to have a thirty-day notice to quit before Double H could sue him for possession-Double H waited until December 20, 2004, to file its suit for possession, arguably sleeping on its rights until that time.[15] Not only that, but Double H did not manage to serve David with its complaint until January 14, 2005, once again delaying pursuit of its demand that David pay a higher rent to remain on the premises. And, as noted earlier, it appears that Double H cashed his check for $1,488 for February 2005, not seeking a protective order until February 18, 2005, and even then agreeing to payments into the court registry of $1,561 (rather than the $1,611 that it told David was the monthly rent amount). Accordingly, for November and December 2004 and January and February 2005, it is not immediately clear whether the amount that David was liable to pay for occupancy of his apartment was the $1,611 that Double H demanded, the $1,561 that the par-

---

**14.** Cf. *Novak v. Cox*, 538 A.2d 747, 751 (D.C. 1988) ("once the notice to vacate became effective, there is nothing in the law that gave the tenant the right to remain in the house without paying what the landlord gave notice he was charging").

**15.** Thus, another possibility is that David "h[e]ld over without the consent of the landlord, and merely through the laches of the latter," and was a tenant at sufferance for the months in issue. 52 C.J.S. *Landlord & Tenant* § 285. Our case law establishes that where a tenant holds over as a tenant at sufferance without abiding by the landlord's rent terms, the landlord's damages are the " 'reasonable value' for 'continued use and occupancy of the premises.' " *Hinton v. Sealander Brokerage Co.*, 917 A.2d 95, 107 (D.C. 2007) (quoting *Habib v. Thurston*, 517 A.2d 1, 13 n. 16, 18 (D.C.1985)); *see also Habib*, 517 A.2d at 14 n. 16 (noting that if a landlord "prevails on a notice to quit, the tenant will have been in possession, after the notice expired, in the status of a holdover tenant. In that case, the landlord will be entitled not to

the rent specified in the expired lease, but to the reasonable value of the premises during the tenant's continued occupancy"); *cf. Welk v. Bidwell*, 136 Conn. 603, 73 A.2d 295, 298 (1950) (holding that a month-to-month tenant who held over after refusing to pay the rent increase announced by the landlord became a tenant at sufferance, who was obligated not to pay the amount demanded by the landlord, but instead the reasonable rental value of the property occupied). "Reasonable value" is " 'determined presumptively'—but not conclusively—by reference to 'the rent the tenant had been paying.' " *Hinton*, 917 A.2d at 107 n. 19, quoting *Habib*, 517 A.2d at 13 n. 16, 18. But if the landlord establishes that the reasonable rental value is a higher amount—perhaps higher than the landlord had demanded—the landlord is entitled to recover that higher amount. *cf. Barrett*, 1985 Conn.Super. LEXIS 158 at *3, *6 (holding that reasonable rent for months after landlord began returning tenant's checks for $600 was $1,500, because the landlord had obtained an appraiser's report setting the rental value at the higher amount).

ties apparently agreed David would pay monthly into the court registry, the $1,488 Double H accepted from David for the previous fifteen months and then again in February 2005, or some other amount.[16]

The record does not reveal the reasons for these varied and seemingly inconsistent actions by Double H. We conclude that a remand is in order so that the trial court—taking any additional evidence that it believes is relevant—can sort out which of a number of potentially applicable doctrines might apply to dictate the payment amount(s) for which David is liable for these months.

To summarize, we reverse the trial court's ruling that in no case may a landlord condition a discount from an otherwise applicable rent increase on a month-to-month tenant's agreement to enter into a new lease; we affirm the trial court's ruling that David's rent amount was $1,488 for the months in issue through October 2004; and we remand for a determination of the amount(s) for which David is liable for the months of November and December 2004 and January and February 2005.[17]

*So ordered.*

16. *See Nicholas v. Howard*, 459 A.2d 1039, 1041 (D.C.1983) ("absent an agreement to pay rent, the tenant is not under any obligation to pay rent. . . . [However,] the tenant [may be] liable for the reasonable worth of his use and occupation and the landlord is entitled to recover in an appropriate action the amount owed by the tenant. This amount is not rent, and hence the landlord's rights thereto are not the rights he has with respect to rent.") (citations and internal quotation marks omitted); *see also Novak*, 538 A.2d at 751 n. 4 (distinguishing *Nicholas* on the ground that "there we found that the appellant, a new owner, had never negotiated a rental agreement with the tenants of the grantor").

17. Regarding March 2005 and later months when a protective order was in place, the record indicates that the parties reached an agreement pursuant to which they directed the court to disburse the funds to Double H. We therefore see no need to consider what rent amount was owed for those months. If, as it appears, David remained in possession upon agreeing to a new rent amount, the issue of possession is moot, and so we also do not address that issue.