*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CV-1158

CHARLES MINES, APPELLANT,

V.

CATHIE GILL, INC., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(LTB-16989-13)

(Hon. Anthony C. Epstein, Trial Judge)

(Submitted October 16, 2014　　　　　　　　　　Decided May 7, 2015)

Charles Mines, *pro se*.

*Carol S. Blumenthal*, was on the brief for appellee.

Before FISHER and EASTERLY, *Associate Judges*, and BELSON, *Senior Judge*.

EASTERLY, *Associate Judge*:　The issue presented in this case is whether a trial court may grant a landlord (or his agent) judgment of possession and an award of back rent based on a rent increase which the tenant has objected to and refused to pay. A landlord of a non-rent-controlled property, who is unconstrained by lease terms, may certainly seek to rent his property for any amount he thinks the market will bear; and if the tenant in occupancy refuses to pay the rent a landlord

wishes to charge, the landlord may direct the tenant to vacate the apartment so the landlord may rent to someone else. But, as this court's precedent makes clear, a landlord may not unilaterally raise the rent over a tenant's objection and then obtain a back rent award for the amount the tenant has refused to pay. Because Cathie Gill, Inc., improperly received such an award, we now reverse and remand for proceedings consistent with this opinion.

## I. Facts

The tenants in this case, Charles Mines and his wife, initially rented the property in question, an apartment, in June 2011. They signed a one-year lease setting their rent at $3,000/month. Shortly before the lease expired in 2012, the two owners of the apartment ("the landlords") asked the tenants to sign a new one-year lease with a 3% rent increase. The tenants ultimately declined to sign a new lease but remained in the apartment; it was their understanding that their expired lease terms remained in effect. As to the landlord's understanding of the situation the record is silent, but there is no indication in the record that the landlords objected or asked the tenants to leave. Instead, this arrangement continued, apparently without incident, for seven months. Then, at the end of 2012, Cathie

Gill, a management company hired by the landlords, contacted the tenants. Cathie Gill informed the tenants that, going forward, it would collect the rent on the landlords' behalf, and it gave the tenants notice of a 6% rent increase ($3,180), effective February 1, 2013. The tenants again declined to pay an increase in rent and continued to pay $3,000/month, apparently still to the landlord.[1] Again, there is no indication in the record that Cathie Gill (or the landlords) objected to the tenants' failure to pay the rent increase or asked the tenants to leave. Five months later, on June 28, 2013, Cathie Gill filed suit for a judgment of possession and an award of back rent based on the unpaid rent increase.

At trial, Mr. Mines proceeded *pro se*; Cathie Gill was represented by counsel. The proceedings were informal and took the form of a conversation between the court, counsel for Cathie Gill, and Mr. Mines. Neither party disputed the history of their relationship detailed above. Mr. Mines argued that he and his wife had never agreed to pay more for their apartment and thus they were only obligated to pay the landlords the $3,000/month as negotiated in the (expired) June

---

[1] Cathie Gill presented as an exhibit on appeal a letter from the landlords sent after the date of the desired rent increase reminding the tenants to send their payments to Cathie Gill. This is the last communication in the record between the tenants and the landlords (or Cathie Gill as the landlords' agent) before Cathie Gill filed suit.

2011 lease.[2] To support this argument, Mr. Mines attempted to rely on paragraph 24 of his expired lease addressing "termination/hold-over," which provided, *inter alia*, that "[i]f Tenant shall hold over after the expiration of the term of this Lease, tenant shall, in the absence of any written agreement to the contrary, be a Tenant from month to month at the monthly rate in effect during the last month of the expiring term."[3] Meanwhile, Cathie Gill acknowledged the tenants' continued payment of $3,000/month, but argued that the tenants were responsible for paying the demanded rent increase.

The trial court ruled for Cathie Gill, explaining to Mr. Mines that once the lease expired, the landlords, with reasonable notice, were free to raise the rent in any amount they chose (since the apartment was not rent-controlled) and that Mr.

---

[2] Mr. Mines also argued that the landlords could not engage a property manager not identified in the (expired) June 2011 lease and that they had not properly registered with the District of Columbia. He has not pursued these arguments on appeal.

[3] The gravamen of Mr. Mines's argument was that he and his wife had not agreed to the rent increase, and thus this issue was adequately presented in the trial court and preserved for our review. That said, we have no doubt that the manner in which this case was litigated by a *pro se* litigant, and in particular, that Mr. Mines's focus on his expired lease and his arguments why he thought the landlords were not authorized to raise the rent, *see* supra note 2, obscured the central issue before the trial court: *i.e.*, whether Cathie Gill, as the landlords' agent, could obtain a back rent award based on a rent increase to which the tenants had objected.

Mines and his wife, if they remained in the apartment, were obligated to pay that amount. The trial court accordingly awarded $1,586 in back rent, late fees, and court costs to Cathie Gill.

## II. Analysis

We review *de novo* the following question of law: whether, based on the facts undisputed by the parties, the tenants had an obligation to pay the demanded rent increase.[4] Mr. Mines, proceeding *pro se*, argued that he and his wife were entitled to remain in the apartment, paying the same amount of rent set by the expired lease. The trial court determined, however, that Cathie Gill, as the landlords' agent, was entitled to raise the rent with reasonable notice, and that the tenants would be obligated to pay if they remained in possession. In other words, the trial court adopted Cathie Gill's argument that the landlord could unilaterally determine the amount of rent to be paid. As with any type of contract, however,

---

[4] *See Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 582 (D.C. 1995) (reviewing the "substantive rules of contract law" relating to a lease *de novo*, specifically whether there was a "meeting of the minds"); *cf. Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A.2d 480, 490 (D.C. 2005) (acknowledging that whether appellants had status of tenant was a legal question properly reviewed *de novo*).

there must be both an offer and acceptance before there is an enforceable agreement. The record before us establishes that there was no agreement, express or implied, for the tenants to pay a 6% rent increase for a month-to-month tenancy after their lease expired in June 2012. And in the absence of such an agreement, the court could not award the landlords back rent, although it could award the landlords damages based on fair use and occupancy value (if Cathie Gill presented such evidence).

We begin our analysis by clarifying what, if any, agreement the landlords and the tenants had vis-a-vis the payment of rent at the time that Cathie Gill, as an agent for the landlord, sought to increase the tenants' rent in February 2013. Mr. Mines argued at trial, as he does on appeal, not only that he and his wife did not agree to pay a 6% rent increase, but also that the June 2011 lease, in particular paragraph 24 (addressing termination/holdovers), was still operative in February 2013, and froze their rent to the amount bargained for in the lease. But the lease was only for one year, and it had expired by the time Cathie Gill sought to raise the rent.

This does not mean, however, that the landlords and the tenants had no legally recognized agreement with respect to the tenants' continued occupancy of the apartment. At the end of a contractual lease term, if a new lease is not signed but the tenant remains, a landlord has two choices: the landlord may refuse to allow the tenant to remain in the property[5] or the landlord may implicitly agree to the tenant's continued occupation of the property and a holdover tenancy may commence.[6] The creation of such a tenancy is a function of statute in the District.[7] This is a periodic, month-to-month tenancy, whereby the tenant is bound to the original lease's terms, including the amount of rent.[8] Each party to this implicit

---

[5] *See* D.C. Code § 42-3201 (2012 Repl.) ("When real estate is leased for a certain term no notice to quit shall be necessary, but the landlord shall be entitled to the possession, without such notice, immediately upon the expiration of the term.").

[6] *See* D.C. Code § 42-520 (2012 Repl.) ("All estates which by construction of the courts were estates from year to year at common law, as where a tenant goes into possession and pays rent without an agreement for a term, or where a tenant for years, after the expiration of his term, continues in possession and pays rent and the like, and all verbal hirings by the month or at any specified rate per month, shall be deemed estates by sufferance.").

[7] *Id.*

[8] *See, e.g.*, *Sanchez v. Eleven Fourteen, Inc.*, 623 A.2d 1179, 1181 (D.C. 1993) ("A holdover tenant is bound by the terms and conditions of the original lease and is liable to the landlord at least for rent or its equivalent."); *Estate of Wells v. Estate of Smith*, 576 A.2d 707, 712 (D.C. 1990) ("[W]here a tenant holds over, there is an implied continuation of all the terms of the previous agreement, including covenants to maintain."); *Friedman v. Sherman*, 74 A.2d 57, 58 (D.C. 1950) ("A tenant continuing in possession and paying rent under an expired lease becomes a tenant at sufferance and such tenancy is impliedly subject to the (continued . . .)

agreement is entitled to a 30-day notice to end this tenancy.[9] The landlords in this case opted not to evict the tenants and thus a holdover tenancy commenced in June 2012.

The question is what happened to this holdover agreement when, seven months into the holdover tenancy, Cathie Gill notified the tenants that, in a month's time, the rent would increase by 6%. Cathie Gill took the position at trial that, the tenants' objection to the rent increase notwithstanding, the fact that the tenants had remained in the apartment meant that they were obligated to pay the increased rental amount. Put another way, Cathie Gill argued that the terms of the holdover tenancy were unilaterally altered by the landlords and that the tenants were bound by this change. This is not the law.

---

(. . . continued)
provisions of the expired lease."); *Hampton v. Mott Motors*, 32 A.2d 247, 248 (D.C. 1943) ("We think the reasonable construction of Section 820 is that [it] . . . does not have the effect of releasing either the landlord or the tenant from the implied obligation that the holding over is subject to all the covenants and terms of the original lease applicable to the new situation.").

[9] D.C. Code § 42-3202 (2012 Repl.) ("A tenancy from month to month, or from quarter to quarter, may be terminated by a 30 days notice in writing from the landlord to the tenant to quit, or by such a notice from the tenant to the landlord of his intention to quit, said notice to expire, in either case, on the day of the month from which such tenancy commenced to run.").

"[A] unilateral statement of rent does not per se create a contract."[10] Instead, all contracts, including contracts to rent property, require offer and acceptance, i.e., "a meeting of the minds."[11] The fact that a tenant has remained in an apartment after a demanded rent increase does not necessarily indicate that such a meeting of the minds has occurred. As the court explained in *Groner*, "[i]t is generally agreed that where a landlord notifies a tenant that he must pay a higher rental if he remains in possession and the tenant *without objecting* continues in possession, the tenant will be regarded as having impliedly agreed to the increase and is bound to pay it."[12] But "[i]f a landlord insists on one rate of rental and the tenant insists on another, there is no meeting of the minds. . . . The law will not, by implication, infer an acceptance by the defendant of the terms which he had so persistently refused and which plaintiff had so insistently demanded as a condition."[13]

---

[10] *Double H Hous. Corp. v. David*, 947 A.2d 38, 43 n.11 (D.C. 2008) (internal quotation marks omitted). We note that neither party cited *Double H* to the trial court.

[11] *Groner v. Townhouse Realty, Inc.*, 235 A.2d 324, 325 (D.C. 1967). We note that neither party cited *Groner* to the trial court.

[12] *Id.* at 325 (emphasis added); *see Summerbell v. McDonnell*, 197 A.2d 150, 151 (D.C. 1964) ("The general rule is that where a tenant has notice from his landlord that if he retains possession he must pay a higher rent, specified as to amount, and the tenant remains in possession, he is deemed to have assented to the increase.").

[13] *Groner*, 235 A.2d at 325 (internal quotation marks omitted); *see Double H*, 947 A.2d 38 (declining to hold that a landlord was entitled to recover the (continued . . .)

It was undisputed at trial that the tenants in this case refused to pay the rent increase. Mr. Mines explained that he had not agreed to a 3% increase requested at the end of his lease term and he had not agreed to the 6% rent increase announced seven months into his holdover tenancy. And indeed Cathie Gill acknowledged that Mr. Mines had objected by letter to the 6% rent increase and had continued to pay $3,000 in rent until Cathie Gill filed suit. Under the circumstances, Cathie Gill could not obtain a judgment for possession or for back rent based on a rent increase it knew the tenants had refused to pay.[14]

The only remaining question, then, is whether Cathie Gill, as the landlords' agent, was entitled to damages based on fair use and occupancy value.[15] More

---

(. . . continued)
amount of a rent increase from a holdover tenant who had objected to the demanded rent increase but remained in his apartment paying his old rent).

    This court in *Groner* was swift to note that our holding did not "mean that appellant could occupy [the contested property] free of charge." 235 A.2d at 325. Rather, the court explained he was "liable for the reasonable value of the use and occupation of the space." *Id.*; *see Sanchez*, 623 A.2d at 1182 n.5 (explaining that the "measure of damages for the unlawful detention of leased premises" generally turns on the fair and reasonable rental value, but also may include consequential damages).

    [14] Cathie Gill relies on *Molla v. Sanders*, 981 A.2d 1197 (D.C. 2009), to argue that landlords may unilaterally increase rent on holdover tenants, but *Molla* did not pass judgment on that issue. *Id.* at 1201-02.

    [15] *See supra* note 13.

particularly, the question is whether Cathie Gill is entitled to recover more than the $3,000/month the landlords received while the tenants occupied the property. Damages not having been recognized as Cathie Gill's only recourse, no evidence was presented to substantiate a damages award. Nor was Mr. Mines given the opportunity to fight a damages award, perhaps by demonstrating that the landlords had received and accepted his payment of $3,000 without reservation, thus indicating that there had been accord and satisfaction.[16] Remand of the case is thus required to allow the parties to litigate these issues.

For the reasons set forth above, we vacate the award of $1,586 in back rent, late fees, and court costs to Cathie Gill and remand the case to the trial court for further proceedings consistent with this opinion.[17]

---

[16] *See Double H*, 947 A.2d at 43 (finding that where the landlord had for twelve months accepted payments made by the tenant at the lower rent, there was accord and satisfaction and that the landlord could not recover for an arrearage based on the tenant's failure to pay a demanded rent increase).

[17] In his brief to this court, Mr. Mines asks us to direct the trial court to "have the sum total of the rent increase monies I have paid to date returned to me," which he represents as $2,846. This request concerns matters outside the record on appeal and beyond the scope of our review of the trial court's order awarding Cathie Gill $1,586 in back rent. Thus we decline to address it.

*So ordered.*